©COPY

1 | LEXINGTON LAW GROUP LLP
Mark N. Todzo, State Bar No. 168389
2 | mtodzo@lexlawgroup.com
Lisa Burger, State Bar No. 239676
3 | lburger@lexlawgroup.com
1627 Irving Street
4 | San Francisco, CA 94122
Telephone: (415) 759-4111
5 | Facsimile: (415) 759-4112

6 | Attorneys for Plaintiff
J.B.W., a minor, by and through
7 | Julz W., parent and guardian ad litem

8

9

10 | UNITED STATES DISTRICT COURT

11 | CENTRAL DISTRICT OF CALIFORNIA

12 | **CV09-02488 ODW FMOx**

13 | J.B.W. (a minor, by and through Julz W., | Case No.
14 | parent and guardian ad litem) on Behalf | COMPLAINT
of Himself and All Others Similarly
15 | Situated, | CLASS ACTION

16 | Plaintiff,

17 | vs. | JURY TRIAL DEMANDED

18 | UNITEDHEALTH GROUP, INC.,
19 | INGENIX, INC., WELLPOINT, INC.
and BLUE CROSS OF CALIFORNIA,
20

21 | Defendants.

22

23

24

25

26

27

28

COMPLAINT – J.B.W., ET AL. v. UNITED HEALTH GROUP, ET AL.

## JURISDICTION AND VENUE

1.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, in that some of the claims asserted herein are brought under federal statutes and necessarily involve adjudication of one or more federal questions. For Plaintiff's Sherman Act claims, jurisdiction arises under 28 U.S.C. § 1331 and 28 U.S.C. § 1337. For Plaintiff's breach of contract, breach of the covenant of good faith and fair dealing and unfair competition claims, jurisdiction arises under 28 U.S.C. § 1332(d)(2) as Plaintiff seeks certification of classes of all persons throughout the United States who contracted with Defendants for health insurance pursuant to an individual and family plan and used and were reimbursed for ONS. Plaintiff is located in California and Defendants are located in Minnesota, Indiana and California. The amount in controversy exclusive of interest and costs exceeds $5 million.

2.     This Court has personal jurisdiction over the parties because Plaintiff submits to the jurisdiction of this Court, and each Defendant systematically and continuously conducts business in this State, and otherwise has minimum contacts with this State sufficient to establish personal jurisdiction over each of them.

3.     Venue is appropriately established in this Court under 28 U.S.C. § 1391 because Defendants conduct a substantial amount of business in this District, including marketing, advertising and selling insurance products, and administering health plans to residents inside this District.

## INTRODUCTION

4.     Plaintiff, J.B.W. (a minor, by and through Julz W., his parent and guardian ad litem), on behalf of himself and all others similarly situated, by and through his undersigned attorneys, alleges, upon knowledge with respect to his own acts and upon information and belief with respect to all other matters, as follows.

5.     The selection and purchase of health insurance is of vital importance

to consumers. According to a recent survey by the New York Attorney General, obtaining affordable healthcare is the number one concern of consumers. This case is about a secret and intentionally concealed agreement among health insurers to depress reimbursements for out-of-network services ("ONS"), thus raising the cost of healthcare for consumers.

6. Many health insurers, including defendants WellPoint, Inc. ("WellPoint") and Blue Cross of California, offer health insurance plans that differentiate between coverage for medical treatment from: (i) in-network providers who have negotiated discounted rates with the insurer; and (ii) out-of-network providers who charge insured consumers their usual, non-discounted rates. Health insurance plans that permit insured individuals ("members") to seek medical care from out-of-network providers are more expensive than plans that limit members to care provided by in-network providers – i.e., they require higher premium payments.

7. For members who have contracted for the right to obtain out-of-network benefits, and agreed to pay higher premiums in exchange for that flexibility, health insurers including defendants WellPoint and Blue Cross of California promise to reimburse members for ONS at a percentage of the lesser of either: (i) the actual amount of their medical bills; or (ii) the usual and customary rate ("UCR") of doctors in the same or similar geographic area for the substantially the same service. However, WellPoint and Blue Cross of California actually reimburse their members at a much lower rate.

8. Plaintiff's claims in this case are directed at a secret and illegal agreement by defendants WellPoint, Blue Cross of California, UnitedHealth Group, Inc. ("UHG"), Ingenix, Inc. ("Ingenix"), and most of the country's largest health insurers to systemically under-reimburse consumers for ONS. From at least as early as 1998 to the present (hereinafter, the "Relevant Time Period"), WellPoint, Blue Cross of California, and other health insurance companies agreed

1  to manipulate the rates used to reimburse members for ONS.  Pursuant to this

2  agreement, Defendants and their co-conspirators knowingly created, manipulated,

3  and used flawed data to set artificially low reimbursement rates for ONS.

4      9.    Defendants' conduct affects millions of consumers nationwide who

5  have had to pay more for ONS as a result of Defendants' illegal agreement.  The

6  instrument to accomplish this conspiracy is a data services platform known as the

7  Ingenix Database, maintained by Ingenix, which is wholly-owned and operated by

8  UHG.  WellPoint, Blue Cross of California and the co-conspirators named in

9  paragraphs 25 and 26 herein ("Co-Conspirators") contract with Ingenix to provide

10  ONS data claims and receive uniform pricing schedules which are used to calculate

11  ONS reimbursements at artificially low rates (hereinafter "False UCRs") that are

12  presented as UCRs but are in fact substantially below the actual UCR.

13      10.    Ingenix serves as the conduit of the conspiracy and is the hidden profit

14  engine of the health insurance business.  Ingenix contracts with most of the

15  country's largest health insurers, including WellPoint, Blue Cross of California and

16  the other Co-Conspirators, to collect ONS claims data.  After Ingenix collects the

17  data, it aggregates and manipulates those data to create False UCR schedules that it

18  sells to most of the country's largest health insurers, including WellPoint and Blue

19  Cross of California.  Using the False UCR schedules, WellPoint, Blue Cross of

20  California and its Co-Conspirators were able to under-reimburse Plaintiff and the

21  Damages Classes, defined herein, for ONS.

22      11.    WellPoint, Blue Cross of California and its Co-Conspirators hid this

23  scheme, including the existence and purpose of the Ingenix Database, through a

24  series of material omissions and misrepresentations.  There is an inherent and

25  irreconcilable conflict of interest in having a price-setting mechanism, the Ingenix

26  Database, which is controlled by UHG, WellPoint, Blue Cross of California, and

27  other health insurers, create uniform pricing schedules.  Since these health insurers

28  have an incentive to artificially deflate the amounts they have to reimburse

members for ONS, it is not surprising that their use of the Ingenix Database results in the systematic under-reimbursement of members for ONS.

12.     Until recent news reports detailed the New York Attorney General's investigation, the process of setting UCRs used to determine ONS reimbursement was effectively hidden from consumers. This lack of transparency was facilitated by the following practices:

- In their healthcare plans that cover ONS treatment, WellPoint, Blue Cross of California, and other insurers affirmatively represented that they will reimburse according to UCRs, which the reasonable consumer would understand to literally mean the "usual and customary rate" charged for such services;

- Defendants did not disclose a conflict of interest, *i.e.*, that the Ingenix Database, which is owned and controlled by insurance companies in agreement with WellPoint, Blue Cross of California, and other insurers, are used to determine False UCRs;

- Defendants concealed that the insurers regularly and intentionally exclude important data points to depress UCRs and under-reimburse for ONS; and

- Defendants concealed that Ingenix scrubs the data it receives from WellPoint, Blue Cross of California, and other insurers to remove information that would result in higher reimbursement rates.

13.     As a result, Plaintiff and the other members of the Classes and California Subclass did not know that Ingenix existed, let alone how it functioned, what the true UCRs were, or how much they were harmed as a result of Defendants' illegal conspiracy.

14.     Plaintiff alleges (i) direct agreements in the form of contracts between Ingenix and many of the country's largest health insurers, including WellPoint and Blue Cross of California, to obtain and/or provide UCR pricing information; and

- 4 -

(ii) a lengthy chronology of facts that demonstrates a conspiracy between and among WellPoint, Blue Cross of California, UHG, Ingenix, and their Co-Conspirators to use Ingenix to develop False UCRs that are in turn used to determine the amount to reimburse members for ONS. This conduct violates § 1 of the Sherman Act.

15. WellPoint and Blue Cross of California's actions also constitute a breach of their healthcare plans, including Plaintiff's individual and family plan, by agreeing to reimburse for ONS as a percentage of the UCR, when in fact, WellPoint and Blue Cross of California reimburse for ONS at a much lower rate by using manipulated, flawed and inadequate data to determine False UCR amounts, resulting in reimbursements for ONS that are well below the percentage of UCR promised by Defendants. Thus, WellPoint and Blue Cross of California breached their contracts with Plaintiff and the Contract Damages Class as defined below, as well as the covenant of good faith and fair dealing.

16. Plaintiff further alleges that Defendants violated the false advertising and unfair competition laws of California. The effect of Defendants' unlawful conduct and misrepresentations on consumers, including Plaintiff and the other members of the California Subclass, is profound. Overall out-of-pocket costs of healthcare insurance and choice of provider are the two most important aspects of healthcare to consumers. Defendants' conspiracy and misrepresentations affect both of these aspects of healthcare since Defendants represent through their advertising and plan contracts that they will permit their members to choose between in-network and out-of-network providers and that members will be reimbursed based on the UCR for ONS. Nevertheless, Defendants do not reimburse for ONS based on the UCR, instead utilizing reimbursement rates that they know are artificially deflated, thereby increasing the costs to consumers of using ONS and deterring consumers from freely choosing between in-network and out-of-network providers. By affirmatively misrepresenting the extent to which

they will reimburse for ONS and the extent to which consumers can choose between in-network and out-of-network providers, and by failing to disclose that reimbursement for ONS is calculated based on False UCRs, Defendants have deceived Plaintiff and the other members of the California Subclass (as defined below).

<strong>PARTIES</strong>

<u>Plaintiff</u>

17. Plaintiff, J.B.W. (a minor by and through his parent and guardian ad litem), is a citizen of the State of California. Simultaneous with the filing of this complaint, Plaintiff has filed a petition for the appointment of Julz W., his mother, as his guardian ad litem in this matter. While insured by WellPoint (Blue Cross of California), Plaintiff received artificially deflated reimbursement for ONS, resulting in Plaintiff incurring more out-of-pocket expense than he would have absent the unlawful conduct alleged herein.

<u>Defendants</u>

18. Defendant UHG offers, among other things, health insurance products and services. A Minnesota corporation, UHG's principal place of business is at 9900 Bren Road East, Minnetonka, Minnesota 55343.

19. Defendant Ingenix is a wholly-owned subsidiary of UHG and offers a comprehensive line of clinical and cost management solutions for health care payers, providers, employers, pharmaceutical manufacturers, government agencies and others. The company's products and services are represented by four business groups including: (i) software and data services; (ii) publishing; (iii) pharmaceutical services; and (iv) consulting. Ingenix licenses the use of its proprietary Ingenix Database to insurers who use it to set reimbursement schedules for out-of-network, non-negotiated medical services. A Minnesota corporation, Ingenix's principal place of business is at 12125 Technology Drive, Eden Prairie, Minnesota 55344.

20.     Collectively, UHG and Ingenix are sometimes referred to herein as the "UHG Defendants." The UHG Defendants joined the conspiratorial activity alleged herein and are legally responsible for the unlawful conduct because their directors, members, officers, employees, and agents, acting in the scope of their authority, reached an unlawful agreement with their competitors to restrain competition. Alternatively, the UHG Defendants are legally responsible because they acted through, facilitated, dominated, or controlled the actions of each other in furtherance of the unlawful conspiratorial activity alleged herein.

21.     Defendant WellPoint is the country's largest health insurer, insuring more than 33 million persons across the United States, including Plaintiff, via its "Blue Cross of California" Division. An Indiana corporation, WellPoint has its corporate headquarters at 120 Monument Circle, Indianapolis, Indiana 46204, and is licensed to conduct business in all fifty states.

22.     Defendant Blue Cross of California operates through the trade name Anthem Blue Cross and is a division of Defendant WellPoint. WellPoint, through Blue Cross of California issued the Evidence of Coverage and Disclosure Form that was provided to Plaintiff. The Evidence of Coverage and Disclosure Form provides that Blue Cross' customer service departments are located in Oxnard and Los Angeles, California and that the submission of claims must be made to Blue Cross of California's Los Angeles office. Blue Cross of California is located at 21555 Oxnard Street, Woodland Hills, California.

23.     WellPoint was created in or around 2004 by the merger of WellPoint Health Networks, Inc. with Anthem, Inc. The merged companies changed their name to WellPoint, Inc. on or about November 30, 2004. As the successor entity to Anthem, Inc., WellPoint, Inc., is liable for Anthem's actions both before and after the merger between the two companies.

24.     WellPoint serves customers throughout the United States, including California, under various names such as HealthLink, Unicare, and Blue Cross Blue

Shield.  WellPoint also serves California insureds through its subsidiary, Blue Cross of California.  WellPoint operates, trades or otherwise does business through a variety of subsidiary companies and/or affiliates including, but not limited to, the following:

- Anthem Blue Cross and Blue Shield Plan Administrator, LLC
- Anthem Blue Cross Blue Shield Partnership Plan, Inc.
- Anthem Blue Cross Life and Health Insurance Company
- Anthem Health Plans of Kentucky, Inc., d/b/a/ Anthem Blue Cross and Blue Shield
- Anthem Health Plans of Maine, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans of New Hampshire, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans of Virginia, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Health Plans, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Insurance Companies, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Anthem Life Insurance Company
- Anthem Life & Disability Insurance Company
- Blue Cross and Blue Shield of Georgia, Inc.
- Blue Cross Blue Shield Healthcare Plan of Georgia, Inc.
- Blue Cross Blue Shield of Wisconsin, d/b/a Anthem Blue Cross and Blue Shield
- Blue Cross of California, d/b/a Anthem Blue Cross
- Blue Cross of California Partnership Plan, Inc., d/b/a Anthem Blue Cross Partnership Plan
- Claim Management Services, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Community Insurance Company, d/b/a Anthem Blue Cross and Blue Shield
- Compcare Health Services Insurance Corporation, d/b/a Anthem Blue Cross and Blue Shield

- Empire HealthChoice Assurance, Inc., d/b/a Empire Blue Cross Blue Shield
- Empire HealthChoice HMO, Inc., d/b/a Empire Blue Cross Blue Shield HMO
- Golden West Health Plan, Inc.
- HealthKeepers, Inc.
- Healthy Alliance Life Insurance Company, d/b/a Anthem Blue Cross and Blue Shield
- HMO Colorado, Inc.
- HMO Colorado, Inc., d/b/a HMO Nevada
- HMO Missouri, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Machigonne, Inc.
- Matthew Thornton Health Plan, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Peninsula Health Care, Inc.
- Priority Health Care, Inc.
- RightCHOICE Managed Care, Inc., d/b/a Anthem Blue Cross and Blue Shield
- Rocky Mountain Hospital and Medical Service, Inc. d/b/a Anthem Blue Cross and Blue Shield
- UNICARE Health Insurance Company of Texas
- UNICARE Health Insurance Company of the Midwest
- UNICARE Health Plan of Kansas, Inc.
- UNICARE Health Plan of West Virginia, Inc.
- UNICARE Health Plans of Texas, Inc.
- UNICARE Health Plans of the Midwest, Inc.
- UniCare Life & Health Insurance Company
- UNICARE of Texas Health Plans, Inc.
- WellChoice Insurance of New Jersey, Inc.

Co-Conspirators

25.    Other natural persons, corporations and entities participated as Co-Conspirators, including without limitation:

1     (a)     Aetna, Inc. ("Aetna") provides health insurance products and

2     related services, including medical, pharmacy, dental, behavioral health, group life,

3     long-term care and disability plans, and medical management capabilities,

4     primarily in the United States. Aetna participates in the Ingenix Database by

5     providing claims data to Ingenix that Ingenix uses to establish its database of costs

6     for out-of-network health care services and/or by using the False UCRs produced

7     by Ingenix to pay claims made by insureds under its health plans. A Pennsylvania

8     corporation, Aetna's principal place of business is at 151 Farmington Avenue,

9     Hartford, Connecticut 06156.

10     (b)     Cigna Corporation ("Cigna"), through its subsidiaries, provides

11     healthcare and related benefits in the United States and internationally. Cigna's

12     healthcare segment offers consumer-directed health plans, health maintenance

13     organizations, network only and point-of-service medical plans, preferred provider

14     plans, and traditional medical indemnity coverage. Cigna participates in the

15     Ingenix Database by providing claims data to Ingenix that Ingenix uses to establish

16     its database of costs for out-of-network health care services and/or by using the

17     False UCRs produced by Ingenix to pay claims made by insureds under its health

18     plans. Cigna is headquartered at Two Liberty Place, 1601 Chestnut Street,

19     Philadelphia, Pennsylvania 19192.

20     (c)     Oxford Health Plans' ("Oxford"), a subsidiary of UHG,

21     products include its Freedom Network and Liberty Network HMOs, as well as the

22     Freedom Plan and Liberty Plan point-of-service plans. Oxford participates in the

23     Ingenix Database by providing claims data to Ingenix that Ingenix uses to establish

24     its database of costs for out-of-network health care services and/or by using the

25     False UCRs produced by Ingenix to pay claims made by insureds under its health

26     plans. Oxford is headquartered at 48 Monroe Turnpike, Trumbull, Connecticut

27     06611.

28     (d)     Health Net, Inc. ("Health Net") is among the United States'

largest publicly-traded managed healthcare companies. Health Net offers, among other things, health insurance products and services. Health Net participates in the Ingenix Database by providing claims data to Ingenix that Ingenix uses to establish its database of costs for out-of-network health care services and/or by using the False UCRs produced by Ingenix to pay claims made by insureds under its health plans. The Company's headquarters is located at 21650 Oxnard St., Woodland Hills, California 91367.

       (e)    Health Insurance Association of America ("HIAA"), now known as America's Health Insurance Plans ("AHIP") is a trade group for the health insurance industry. It is a national association comprised of a variety of medical entities, including major insurance companies and specifically including many of its fellow Co-Conspirators. It proclaims to provide "a unified voice for the community of health insurance plans" by representing the interests of its members on legislative and regulatory issues at the federal and state levels, and by providing conferences and publications. In 1973, HIAA created a database known as the Prevailing Health Charges System ("PHCS") by obtaining historical charge data for surgical and anesthesia procedures from numerous data contributors, including health insurance companies, third-party payors, and self-insured companies. HIAA later expanded PHCS to include data regarding dental (1977), medical (1988), and drugs/medical equipment (1998). HIAA had committees and advisory groups comprised of various insurance company members that were responsible for PHCS's development and management and which caused the PHCS database to become populated with flawed data. In October 1998, HIAA sold PHCS to Ingenix, and PHCS is now part of the Ingenix Database.

      26.    In addition to Aetna, Cigna, Oxford and Health Net, other health insurance companies, not named as defendants, have participated in the alleged unlawful conspiratorial activity in violation of federal and state law. Such violations include, *inter alia*, knowingly providing flawed and misleading data to

Ingenix for use in developing the Ingenix Database; knowingly acquiescing to flawed and improper manipulation of cost data provided by Ingenix; and knowingly using False UCRs produced by Ingenix in determining reimbursements for ONS.

27.     Whenever reference is made to an act, statement, or transaction of any corporation or entity in this Complaint, including each of the Defendants and Co-Conspirators, the allegation means that the corporation or entity acted, stated or transacted by or though its directors, members, partners, officers, employees, or agents, while they were engaged in the management, direction, control, or conduct of the corporation's or entity's business and acting within the scope of their authority.

28.     At all times mentioned in the allegations herein, each and every Defendant and Co-Conspirator was an agent or representative of and aided and abetted in the unlawful conduct of each of the other Defendants and Co-Conspirators. In doing the things alleged herein, each and every Defendant and Co-Conspirator was acting within the course of such agency or representation and was acting with the consent, permission and authorization of the other Defendants and Co-Conspirators. All actions of each Defendant and Co-Conspirators as alleged herein were ratified and approved by the other Defendants and Co-Conspirators.

## INTERSTATE TRADE AND COMMERCE

29.     Defendants marketed, distributed, and sold or otherwise provided health insurance coverage, including coverage for ONS, to persons throughout the United States, using the means and instrumentalities of interstate trade and commerce. Accordingly, Defendants' unlawful activity had a direct, substantial, and reasonably foreseeable effect upon interstate trade and commerce.

## RELEVANT PRODUCT MARKET

30.     The relevant product market is the market for data used to calculate

UCRs for reimbursement of claims by health insurance beneficiaries for out-of-network, non-negotiated medical services (the "Data Market"). The Data Market is directly linked to, and determines the prices paid by insured consumers who purchase ONS (the "Linked Market"). The Data Market constitutes the primary input to the Linked Market and is used to effectively control and depress amounts reimbursed in that market. Once adopted, the UCR constitutes the critical element in the reimbursement formula applied under each insurance plan and operates as a ceiling to cap the amount that will be reimbursed to the insured consumer. By agreeing to joint control and administration of the Data Market, WellPoint and its Co-Conspirators are able to assure that the prices paid (*i.e.*, reimbursements) by WellPoint and its Co-Conspirators in the Linked Market will be artificially depressed, leading to collective cost-savings for WellPoint, UHG, Blue Cross of California and their Co-Conspirators, with the corresponding increased costs borne by insured consumers who are the purchasers of ONS.

31. The relevant geographic market is the United States.

32. Ingenix, UHG, WellPoint, Blue Cross of California, and their Co-Conspirators jointly produce this data service. Ingenix compiles and administers the Ingenix Database while UHG, WellPoint, Blue Cross of California and their Co-Conspirators provide the raw data necessary for the Ingenix Database.

33. Today, the vast majority of health insurers have agreed to use the Ingenix Database to determine UCRs for reimbursing ONS claims. Indeed, the UHG Defendants promote the Ingenix Database as the "industry standard" for determining UCRs, which insurance companies use to imbue their artificially low reimbursements for ONS with the appearance of legitimacy and accuracy.

34. The Data Market is conducive to the collusion alleged herein.

35. The Data Market has high barriers to entry. The high barriers to entry include: the costs of obtaining historical and current insurers' data; the costs of constructing, developing, and maintaining hardware and software platforms

1  necessary to aggregate, manipulate, and disseminate the data; and the costs of
2  successfully convincing insurers to adopt the services.

3       36.    The cost and difficulty of obtaining historical data poses an
4  exceedingly high barrier to entry, as it requires any new entrant to obtain such data
5  from Ingenix, who controls the spectrum of relevant historical insurer data.

6       37.    The Data Market is a mature market, having been in existence for
7  decades.  There are few competitors and, as described herein, the market has been
8  marked by consolidation among those few competitors, such that Ingenix now
9  provides the vast majority of data in this market.

10      38.    Defendants and their Co-Conspirators had, and continue to have,
11 ample opportunities to communicate among themselves about the conspiracy and
12 combination alleged herein, including the collection and dissemination of data used
13 to establish the UCRs for calculating reimbursement for ONS, as well as at HIAA
14 and now AHIP board meetings where Defendant WellPoint was, and is, a board
15 member.  Indeed, under the terms of the licensing agreements that govern the use
16 of the Ingenix Database, UHG, WellPoint and their insurance company Co-
17 Conspirators are in almost constant communication with Ingenix.

18      39.    Given the existence of the conspiracy, it is in WellPoint's and its Co-
19 Conspirators' collective interest to conspire to provide inaccurate, artificially low
20 health care provider charge information to Ingenix for use in its database.  As
21 cartel members, it is contrary to their collective interests to provide accurate
22 reimbursement rates because each of the Co-Conspirators uses the Ingenix
23 Database for the calculation of reimbursement of ONS.  If any Co-Conspirator
24 were to cheat on the cartel and provide transparent pricing information that
25 accurately reported healthcare provider charges, that accurate information would
26 precipitate competition for ONS reimbursement, resulting in a loss of market share,
27 revenue, and customers by cartel members.

28      40.    Absent the conspiracy, WellPoint and its Co-Conspirators would each

have an incentive to set UCRs accurately and competitively in order to make their insurance products with ONS coverage more attractive to consumers and thus sell a larger number of policies. Their failure to do so is an action against individual self-interest but in favor of their collective conspiratorial interest and provides further evidence of the conspiracy. In purchasing health insurance products, consumers are able to compare virtually all plan provisions to determine which offers the most attractive mix of benefits. Indeed, plans are routinely compared based upon co-pay levels, deductibles, out-of-pocket maximums, numbers of covered visits, pre-existing condition coverage, drug benefits, availability of psychiatric care and numerous other provisions. But when it comes to UCRs, WellPoint and its Co-Conspirators hide their price terms. WellPoint and its Co-Conspirators provide no information about either the amount of their established UCRs, the relationship between those UCRs and amounts actually charged by health care providers in the consumer's locale, or the fact that the UCRs are set in cooperation with other insurers through the use of a shared platform. Instead of providing such information, which would allow consumers to compare the value of ONS benefits in the same way they compare other plan provisions, WellPoint and its Co-Conspirators routinely mislead consumers by including language to the effect that reimbursement will be based on the lesser of the UCR or the actual charge imposed by the health care provider, when they are aware that the False UCR has been artificially deflated by them such that the False UCR will almost always be far lower than the actual charges imposed by ONS providers.

41. Due to the lack of transparency in the determination of UCRs and ONS reimbursement as alleged herein, as well as a non-disclosure agreement by WellPoint and its Co-Conspirators not to provide data to potential competitors of Ingenix, there is no competition among WellPoint or its Co-Conspirators with respect to the determination of UCRs or the reimbursement of ONS. Members of WellPoint health plans and ONS providers themselves have no reasonable

alternative other than to accept whatever ONS reimbursement is offered by
WellPoint and its Co-Conspirators.

### THE INGENIX DATABASE:
### ANATOMY OF A CONSPIRACY

42.     Ingenix is a self-styled nationwide "health care information company"
that sells "customized fee analyzers" to medical providers, healthcare insurers and
automobile liability insurance companies.  Essentially, Ingenix creates "modules"
or uniform pricing schedules, which provide whole dollar payment amounts for
each percentile (for instance, the 80th percentile) for given medical procedures in
various locations.  All users of the database, *i.e.*, WellPoint and its Co-
Conspirators, are given precisely the same dollar amounts by percentile for each
particular procedure and area.

43.     The Ingenix Database is marketed by the UHG Defendants as the
"industry standard."  Defendants UHG and WellPoint, as well as the Co-
Conspirators, all use the same Ingenix-established False UCRs to reimburse for
ONS.

44.     To create the database, Ingenix first enters into contracts/licensing
agreements with health insurers, including Defendants WellPoint, Blue Cross of
California and UHG, as well as the Co-Conspirators, to (i) obtain data regarding
billing rates and information *from* those health insurers; and/or to (ii) provide UCR
uniform pricing schedules *to* those same health insurers, including Defendants
UHG, WellPoint, and Blue Cross of California, for their use in reimbursing for
ONS.  Ingenix actually offers the Ingenix Database and its uniform pricing
schedules to health insurers at a discounted rate if those insurers agree to provide
data to Ingenix to create that very database.  WellPoint and Blue Cross of
California both provide to and receive from Ingenix pricing data.  The billing data
provided by WellPoint and Blue Cross of California is used by Ingenix to create
False UCRs and those False UCRs are in turn used by WellPoint and Blue Cross of

California to determine how much to reimburse their members for ONS.

45. For the creation and continued updating of its database, Ingenix relies entirely on accumulating data from its various information providers (including Defendants and their Co-Conspirators) via its "data contribution program" in which those health insurers that are Ingenix clients submit information about the amounts they happen to have been billed by an undisclosed number of unidentified health care providers for specific "CPT" code services. Current Procedure Terminology ("CPT") codes are a system by which the American Medical Association categorizes all medical services by five-digit codes. The data Ingenix receives has been termed a "convenience sample."

46. Following treatment by an out-of-network provider, that provider submits a standardized claims procedure form to WellPoint; WellPoint then extracts information from that form to submit to Ingenix. However, the only information provided from the claims form to Ingenix are the following four data points: (i) the date of service; (ii) the CPT code; (iii) the zip code where the service was provided; and (iv) the actual amount billed.

47. In or around 2005, members of HIAA, including Wellpoint, discussed submitting more than these four data points to Ingenix because they expressly recognized that the four data points were limited and inadequate to calculate accurate UCRs. Additional potential data points include provider identification, licensure, specialty, patient age and gender, and type of facility where the service was provided.

48. Despite this express acknowledgement that the four data points were limited and inadequate, Defendants and the Co-Conspirators agreed to continue to only submit the four above-listed elements to Ingenix. Thus, WellPoint and its Co-Conspirators understood and agreed that Ingenix would continue to base UCRs on the same insufficient data points it had always been using. Furthermore, WellPoint never advised its members of the inadequacy of the four data points or of its failure

- 17 -

1    to expand those data points.

2      49.    Health insurers thus continue to enter these four simple data points

3 onto a standard claims submission form provided to Ingenix. However, prior to

4 submission to Ingenix, health insurers first "scrub" these claims submissions forms

5 in order to remove the highest charges, thereby submitting only the lowest claims

6 amounts which results in a lower average cost.

7      50.    Therefore, WellPoint, UHG, and the Co-Conspirators all affirmatively

8 manipulate the data they contribute to Ingenix so as to further ensure that the

9 Ingenix Database reports invalid and artificially low UCRs.

10      51.    Furthermore, in 2005, Ingenix changed its data contribution forms to

11 require data contributors to certify with each submission that the contributed data

12 was complete and was not pre-edited or otherwise manipulated. At this point,

13 WellPoint began to provide those required certifications to Ingenix attesting to the

14 fact that its data submission was complete and not pre-edited. WellPoint knew and

15 continues to know that those certifications are false and misleading.

16      52.    Once Ingenix receives the data contribution forms (containing only

17 the four data points), it is then able to combine information from all the

18 contributors (including Defendants and the Co-Conspirators) to create the Ingenix

19 Database.

20      53.    Because it only receives the four data points on the data contribution

21 forms, Ingenix necessarily uses only those four elements (date of service, CPT

22 code, address, and amount billed) to create the Ingenix Database. These four data

23 points do not identify the provider, the patient (including age and condition), any

24 adjustment factors for cost of living, whether physicians or non-physicians

25 performed the services, the provider's usual charge and licensure, the type of

26 facility where the service was performed (*i.e.*, hospital, clinic, doctor's office,

27 nursing home, intensive care unit), or the prevailing fee or charge level for any

28 provider or service in a particular geographic region.

54. In fact, Ingenix actually further ***decreases*** the amount of specificity provided on the data contribution forms by removing any "modifiers" contained on those forms. Modifiers consist of a two-digit number that providers add to a five-digit CPT code to signify an alteration of the stated service or otherwise identify the circumstances in which the service was provided. Modifiers may be used, for example, to indicate that a non-physician has provided the service. In such a situation, the charge would be less than what a physician would normally charge for such a service. Once Ingenix removes a modifier, though, the number is given equal weight as a physician's charge in order to determine the UCR for that service.

55. The Ingenix Database also does not tabulate data according to the specific geographic area where a UCR actually would apply. Instead, Ingenix divides all states into "geo-zips" composed of cities and towns sharing three-digits of postal zip codes, which are then grouped together not only by geographical proximity, but also by what Ingenix arbitrarily decides are "data similarities." These geo-zips are not medical service areas amenable to cost comparison.

56. The distortions created by the use of the geo-zips are recognized by Ingenix itself. In one of its Customized Fee Analyzers provided to health insurers, Ingenix states that:

> Because the fee ranges in the Analyzer are based on the first three digits of your geo-zip, you need to assess where your locale stands in relation to others in this three-digit area. For example, many different three digit areas contain both urban and rural locales with different charging patterns. Use your judgment to determine how to interpret the fee range for your particular community.

57. WellPoint, Blue Cross of California, UHG and the Co-Conspirators fail to exercise reasonable judgment in determining whether the specific geo-zip applicable to a particular UCR determination is valid, including whether it may contain "urban and rural locales with different charging patterns." Instead, WellPoint and Blue Cross of California rely strictly on the geographic groupings

1  provided by the Ingenix Database without taking into account possible different
2  charging patterns within each geo-zip. Thus, WellPoint and Blue Cross of
3  California's ONS determinations have no valid basis, do not comply with its plan
4  documents, are unreasonable, and violate applicable law.

5      58.   Once Ingenix receives data contribution forms from individual
6  insurers (which those insurers themselves have already scrubbed), it further edits
7  the pooled data to remove high end values but not low end outliers. Ingenix does
8  so by using formulaic edits to identify purported statistical outliers and
9  automatically removes them without factual basis or further investigation to
10 determine if they are truly incorrect data points (and should be removed) or are
11 simply valid high charges. The incorrect removal of valid high charges further
12 biases the upper percentile values downward.

13     59.   Based upon these procedures, Ingenix then produces two cycles of
14 uniform pricing schedules a year that include medical, surgical, anesthesia, and
15 coding system service rates for a given geographic area and CPT code. Once
16 WellPoint and Blue Cross of California receive these uniform pricing schedules,
17 they are uploaded onto a computerized claims platform and automatically accessed
18 by Wellpoint and Blue Cross of California to determine reimbursement amounts
19 for ONS.

20     60.   WellPoint and Blue Cross of California's computer systems
21 automatically adjudicate claims for the vast majority of ONS claims. In other
22 words, the Ingenix Database is automatically applied and no human intervention is
23 utilized to evaluate the individual claims or the accuracy of the pricing data
24 provided by Ingenix.

25     61.   WellPoint and Blue Cross of California use the information received
26 from Ingenix to determine reimbursement amounts for ONS even though Ingenix
27 broadcasts that it is not endorsing, approving or recommending the use of the
28 Ingenix data for UCRs. With each production, Ingenix includes the following

disclaimer:

> The Ingenix data are provided to subscribers for informational purposes only. Ingenix, Inc. disclaims any endorsements, approval, or recommendation or particular uses of the data. There is neither a stated nor an implied 'reasonable and customary charge . . . .

62.     Despite this disclaimer, Ingenix provides WellPoint and its Co-Conspirators a uniform pricing schedule (*i.e.*, False UCRs) twice a year and promises them a 16:1 return on investment when using Ingenix.   Thus, Ingenix knows that the Ingenix Database is being used by health insurers for the purpose of determining UCRs.  Indeed, UHG and Ingenix promise that Ingenix Database users, including WellPoint and the Co-Conspirators, will achieve substantial cost savings, including a 16:1 return on investment.  This promise makes sense only if the Ingenix Database is being used to determine reimbursement amounts for ONS. Indeed, the only purpose of the uniform pricing schedule is to establish artificially low rates for ONS reimbursement.

63.     There is no review procedure in place at WellPoint or Blue Cross of California to verify the accuracy of the twice-yearly uniform pricing schedules generated by the Ingenix Database.  Instead, the uniform pricing schedules created by the Ingenix Database are automatically relied upon to determine establish UCRs despite the fact that Ingenix actually informs insurance companies that it is not endorsing, approving or recommending use of its database to determine UCRs.

64.     Likewise, Ingenix cannot guarantee that all claims received for a particular CPT code service at any given time have been reported, much less accurately reported, by its contributing insurers.  Nor can Ingenix ascertain if the bills that are listed constitute the unnamed providers' usual and customary charges for the service, or, instead, a discounted rate required by the agreements one or more of the providers may have had with health care insurers.  While Ingenix requests that the CPT code billing data be accurate and complete, Ingenix remains "at the mercy" of its data contributors with respect to that result because there is no

Ingenix mechanism to enforce or validate the client certificates.

65.     Ingenix has never tested its results to determine if its statistical conclusions bear any relationship to the actual high, low, median or 80th percentile of actual marketplace CPT code service rates charged by health providers in any given area.

66.     The end result of this cycle of collusion is a database that produces flawed uniform pricing schedules (the False UCRs) that systematically result in the under-reimbursement for ONS by WellPoint and its Co-Conspirators.  The flaws in the database are pervasive and include:

(a)     questionable accuracy of underlying data;

(b)     failing to inquire whether all of the contributors are using the same criteria and coding (as well as aggregating) accurately and consistently;

(c)     aggregating data from similar codes to create a large enough sample when there is not enough charge data to provide a statistically valid sample for a CPT code;

(d)     combining geo-zips to determine what Ingenix considers to be a "sociodemographic region" for which there is no verification;

(e)     scrubbing data in such a manner that only removes outliers in a subjective manner, *i.e.*, Ingenix removes high-end values but not low-end outliers;

(f)     failing to incorporate an appropriate statistical methodology (including sampling, data editing or data estimation), resulting in data that are inappropriate and biased downward;

(g)     using cumulated data that has already been scrubbed by the individual contributors to remove high-end values;

(h)     including charges for procedures in non-comparable geographic areas;

(i)     failing to segregate procedures performed by providers of the same or similar skill or licensure, instead combining all CPT codes together;

1           (j)     combining ONS charges with "in-network" providers who have

2   already agreed to a contracted rate – thus further skewing the data downward;

3           (k)     failing to distinguish the data based on the number of medical

4   providers whose charges are reflected; and

5           (l)     failing to edit any data that reflect negotiated or discounted

6   charges.

## THE CONSPIRACY TO CREATE AND FIX UCRs FOR
## THE PURPOSE OF UNDER-REIMBURSING FOR ONS

9       67.    The fundamental roots of the Ingenix Database lie in what is known as

10  the Prevailing Healthcare Charge System (the "PHCS") database.

11      68.    The PHCS was initially created by HIAA, the health insurance

12  industry's main trade association.

13      69.    HIAA, now known as America's Health Insurance Plans ("AHIP"),

14  markets itself as a national association representing providers of health benefits in

15  order to advocate on behalf of health insurance plans and to represent the interests

16  of its members so as to "provide a unified voice for the healthcare financing

17  industry . . . ."

18      70.    Those members included, and continue to include, virtually every

19  major health insurer.  In fact, at the time of drafting this complaint, the Board of

20  Directors of AHIP includes executives of Defendants and the Co-Conspirators,

21  including, but not limited to, the President and CEO of WellPoint and at least two

22  executive vice presidents at UHG.

23      71.    More specifically, various committees within HIAA initially

24  developed and managed the PHCS database – those members made decisions

25  concerning the operation and very design of the database.

26      72.    HIAA initially created the PHCS as a way to aggregate and compile

27  physician charge data as a service to its members.

28

73. HIAA compiled information from its vast pool of member/insurers to create the PHCS which initially pertained to surgical and anesthesia procedures, but within five years of its inception in 1973, began to also include dental, medical, and drugs/medical equipment rates.

74. Once created, the PHCS became the largest pool of charge data for medical services in the country and was considered to be the nation's most comprehensive database of provider charges for private health care services – *i.e.*, the rates charged by physicians and other private healthcare providers. It contained data from more than 150 contributors from 50 states, the District of Columbia, Puerto Rico, and the Virgin Islands.

75. The information HIAA compiled (collected from the members/insurers), however, consisted only of four data points: the date of service, the CPT Code, the billed charge, and the geo-zip. This was the only information that HIAA sought from its members to create the PHCS.

76. In fact, HIAA (via its committees and Board of Directors) consciously decided to limit the amount of information it received from contributors to create the PHCS. In its own documents, HIAA stated that the data was limited and that even the quality of the data was "questionable."

77. Once HIAA obtained the "questionable" data, it compiled the various submissions and created the PHCS which it then submitted to its members as a service. However, HIAA expressly informed insurers that the PHCS was ***not intended to be used to establish UCRs***.

78. The PHCS, thus, was built on submissions from health insurance companies but was not designed to determine precise reimbursement amounts – but only to provide a general idea about prevailing charges in a given area based upon the admittedly limited data that HIAA collected in order to initially create the PHCS.

79. HIAA submitted a disclaimer with the data it provided via the PHCS:

The DATA, whether actual charge data, derived charge data conversion factor data or length of stay data, are provided to the LICENSEE for information purposes only. The HIAA disclaims any endorsement, approval or recommendation of the DATA. There is neither a stated nor an implied 'reasonable and customary' charge, either actual or derived; neither is there a stated nor an implied 'reasonable and customary' conversion factor or length of stay. Any interpretation and/or use of the DATA by the LICENSEE is solely and exclusively at the discretion of the LICENSEE. THE LICENSEE MUST *NOT* represent the DATA in any way other than as expressed in this paragraph.

80. In October 1998, the members of HIAA (including WellPoint) agreed to sell the PHCS to Ingenix for an undisclosed amount. This was part of a plan by Ingenix to acquire a dominant position in the market for the provision of data services used to calculate UCR and that included over 50 acquisitions. Prior to the PHCS purchase, in December 1997, Ingenix purchased the "MDR Price Management" ("MDR") database of derived data from Medicode, Inc. Ingenix would later merge those two databases to form what has herein been referred to as the Ingenix Database.

81. Under the terms of the 1998 sale, HIAA and Ingenix agreed to have member companies participate on an ongoing Ingenix PHCS Advisory Committee, of which WellPoint is a member, which would have input into what and how data were used by Ingenix. Additionally, all HIAA staffers who then worked on the PHCS were offered positions with Ingenix.

82. Furthermore, accompanying the sale to Ingenix, HIAA and Ingenix agreed to a 10-year Cooperation Agreement which provided HIAA with continued input in the development and operation of the PHCS and provided for lasting co-mingling of the two entities in the form of a "Liaison Committee" to advise and evaluate Ingenix.

83. The Cooperation Agreement further provided that Ingenix would charge HIAA members 50% less than non-HIAA members for use of the database *and* that Ingenix would waive all fees for HIAA members that contributed data.

84. Ingenix, upon purchasing the PHCS, also entered into a

Confidentiality Agreement mandating that it shield from disclosure the identity of entities (*i.e.*, the Defendants and Co-Conspirators in this action) that submit information for use in the database.

85. At the time of the sale of the PHCS to Ingenix, and as a condition thereto, UHG agreed to become a member of HIAA.

86. This chain of events serves to demonstrate how Defendants, through HIAA, conspired and agreed to create, expand, continue, promote and use the Ingenix Database to control and set False UCRs among and between WellPoint and its purported horizontal competitors with the ultimate aim of setting ONS reimbursements at below market levels.

87. The agreement by WellPoint and its Co-Conspirators with Ingenix to create and control the data used to establish False UCRs persists to the present.

88. Based on its agreement with HIAA in 1998 and continuing today, Ingenix gives discounts to WellPoint and its Co-Conspirators for supplying it with the pricing data it scrubs to fabricate False UCRs.

89. UHG, WellPoint and the Co-Conspirators each contract with Ingenix to ensure the creation and provision of False UCRs that they use to under-reimburse for ONS.

90. Under the agreements, UHG, WellPoint and the Co-Conspirators provide pricing data to Ingenix. Ingenix in turn combines the pricing data it receives from WellPoint and its Co-Conspirators.

91. As a condition of obtaining uniform pricing schedules from Ingenix, Ingenix and the Defendants as well as the Co-Conspirators also enter into confidentiality and non-disclosure agreements whereby WellPoint and its Co-Conspirator insurers agree not to re-produce any of the data submitted to Ingenix to any other group that seeks to develop a competing database for use in determining UCRs for ONS. These confidentiality and non-disclosure agreements restrain potential competition in the relevant market, and help conceal the agreement to fix

prices as well as the role each Defendant and Co-Conspirator has in that agreement.

92. The Ingenix Database is promoted as the "industry standard," and Defendants UHG and WellPoint, as well as the Co-Conspirators, all use the same Ingenix-established False UCRs to reimburse for ONS.

93. WellPoint and its Co-Conspirators have ample opportunity to, and do, communicate through HIAA (now AHIP where WellPoint is a board member) and regularly share UCR pricing information using Ingenix as a conduit and switch.

94. In return, Ingenix gives each of the Defendants and Co-Conspirators a database of False UCRs based on their combined pricing data.

95. WellPoint and its Co-Conspirators know the data being provided to Ingenix is flawed and have communicated this fact to one another and Ingenix.

96. WellPoint and its Co-Conspirators likewise understand the data received from Ingenix are flawed and cause them to under-reimburse for ONS.

97. WellPoint and its Co-Conspirators continue to have input into the type of data used by Ingenix and to jointly produce provider cost data and False UCRs with and through Ingenix.

98. WellPoint and each of the Co-Conspirators continue to use Ingenix-created False UCRs, essentially a centrally set pricing schedule, as the basis for calculating ONS reimbursement.

99. In order to prevent transparency and inhibit price competition, neither WellPoint nor any of its Co-Conspirators use the publically available and transparent Medicare/Medicaid fee schedule to establish UCRs for reimbursing ONS even though this information is publicly available and free of charge. If WellPoint and its Co-Conspirators had used the Medicare/Medicaid fee schedule for reimbursement of ONS, consumers, including Plaintiff, could have made the decision about which insurer from whom to obtain coverage based on price – which today is impossible due to the opacity of the Ingenix uniform fee schedule.

100. Neither WellPoint nor any of its Co-Conspirators attempted to set up a rival database despite Ingenix's profitability and the fact that it is owned by a competitor. Ingenix's profit margins are 20%, compared to 10% for UHG as a whole. None of the Co-Conspirators disclosed the basis of the False UCRs nor did they reveal that they, along with other horizontal competitors, were supplying and using faulty data.

101. In order to prevent transparency and inhibit price competition, neither WellPoint nor any of its Co-Conspirators disclose to Plaintiff or the general public that they contract with Ingenix, provide Ingenix with data, and use False UCRs provided by Ingenix to determine reimbursement amounts for ONS. They do not disclose how they and Ingenix arrive at False UCRs, or that Ingenix disseminates the False UCRs they all use for calculating ONS reimbursement. They do not disclose they have agreed not to provide data to potential competitors of Ingenix.

102. WellPoint and its Co-Conspirators' scheme to manipulate UCRs for the purpose of under-reimbursing for ONS is predicated, in part, on keeping the Ingenix Database, and its inherent flaws, a complete secret from Plaintiff and the Classes and California Subclass. As a result, WellPoint and its Co-Conspirators actively conceal the true UCRs from Plaintiff and the Classes and California Subclass, knowing the success of the scheme will be jeopardized if any one of them discloses the true UCRs.

103. Rather than disclose the defective nature of the Ingenix Database and the participation by WellPoint and its Co-Conspirators in creating False UCRs, WellPoint and its Co-Conspirators shield these facts from Plaintiff and the Classes and California Subclass and through misrepresentations and material omissions lead them to believe they are using fair and accurate UCR schedules to reimburse for ONS.

## ANTICOMPETITIVE HARM

104. WellPoint and its Co-Conspirators conspired in the market for the

provision of data services in order to create and fix below-market UCRs and to artificially depress reimbursement rates for ONS. Ingenix functions as the conduit and switch that WellPoint and its Co-Conspirators use to share prices and ultimately to fix UCRs. The design and effect of the conspiracy is to artificially deflate reimbursement amounts for ONS. As a result of the conspiracy, WellPoint and its Co-Conspirators have shifted the costs of providing health insurance to Plaintiff and the Classes and California Subclass.

105. WellPoint and its Co-Conspirators agreed through contracts, licenses and oral understandings to provide flawed pricing information to Ingenix and to obtain and use the resulting flawed Ingenix uniform pricing schedules to set ONS reimbursement, thereby depriving Plaintiff and the Class of a competitive market for obtaining ONS.

106. Further, Defendants and their Co-Conspirators agreed not to produce data to any other entity that would seek to provide data services used to calculate UCRs for determining ONS reimbursements.

107. Given Ingenix's 80% market share, the sale of the PCHS database by HIAA, as well as agreements by WellPoint and the Co-Conspirators that tie them to Ingenix, there is no viable competitor in the market for data services used to calculate UCRs.

108. Due to the agreement by Defendants and their Co-Conspirators to manipulate and use a limited number of data points which are used to set the uniform pricing schedules (False UCRs) which Ingenix disseminates and WellPoint and others deploy, competition in the market for the provision of data services used to calculate UCRs is harmed. In turn, competition in the inextricably linked market for the provision of ONS is harmed because of the agreement by WellPoint and its Co-Conspirators to use False UCRs in order to reimburse for ONS.

109. As a result of the anticompetitive and deceptive conduct of WellPoint

1  and its Co-Conspirators alleged herein, resulting in artificially low UCRs and

2  depressed ONS reimbursements, Plaintiff and the Classes and California Subclass

3  pay more for ONS than they would have in a competitive market.

4  **WELLPOINT AND BLUE CROSS OF CALIFORNIA BREACHED THEIR**
**CONTRACTUAL AND ADVERTISING PROMISES TO THEIR**
5  **MEMBERS**

6  110.   During times relevant to the Complaint and continuing through the

7  present, Plaintiff has been, and is, a member of an individual and family health

8  plan issued and administered by defendant Blue Cross of California, a division of

9  WellPoint.  Specifically, Plaintiff enrolled in the Blue Cross Individual PPO

10  $3,500 deductible plan effective November 1, 2008.  During the Relevant Time

11  Period, Plaintiff paid the cost of the premiums for his plan directly to Blue Cross of

12  California.  According to Plaintiff's Agreement, benefits were to be conferred for

13  the subscriber and his enrolled family members.

14  111.   WellPoint and Blue Cross of California issue Combined Evidence of

15  Coverage and Disclosure Forms for individual and family plans (the

16  "Agreements") to Plaintiff and their other members setting forth the benefits

17  WellPoint and Blue Cross of California agree to provide members as well as the

18  costs to the members of the plans.  For example, upon subscribing to the Individual

19  PPO $3,500 Deductible Plan, Plaintiff received his Agreement from WellPoint and

20  Blue Cross.

21  112.   The Agreements are uniform contracts that utilize the same definitions

22  even across different health plans.  The Agreements are one-sided adhesive

23  contracts.  Such contracts are presented on a take it or leave it basis and are not

24  subject to negotiation or alteration by individual members.

25  113.   The Agreements provide members like Plaintiff with an express right

26  to receive treatment from out-of-network providers.  WellPoint and Blue Cross of

27  California refer to these providers as "non-participating," "non-contracting," "non-

network," "non-PPO" and/or "out-of-network" providers. Services by "in-network" providers are reimbursed at discounted rates negotiated between the healthcare provider and WellPoint and/or Blue Cross of California. WellPoint and Blue Cross of California promise in the Agreements to reimburse their members for services by out-of-network providers at a percentage of the lesser of: (i) the actual, billed charge, or (ii) the UCR for the services in the geographic area in which the services were performed. For example, the Agreements state that for "Non-PPO Providers" (i.e., ONS) "the maximum covered expense for services provided by a non-PPO provider or other health care provider will always be the lesser of the billed charge or (1) for a physician, the customary and reasonable charge...." The "customary and reasonable charge" is defined by the Agreements as a "charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region." WellPoint and Blue Cross of California use the terms "UCR," "usual and customary" and "customary and reasonable charge" interchangeably. WellPoint and Blue Cross of California often refer to the amount they will reimburse for ONS as the "amount allowed," "allowed expense" or "allowable charge."

114. For example, Plaintiff's Agreement specifies that there is a set deductible, and that once this deductible is satisfied, WellPoint is required to reimburse its subscribers, including Plaintiff, according to a chart contained within the Agreement. Pursuant to the chart, medical procedures are classified as either being undertaken by a participating or preferred participating provider or by a non-participating provider. "Non-Participating Provider" is defined as an entity (hospital, physician or otherwise) "which does NOT have a Prudent Buyer Plan Participating Provider agreement with [Blue Cross] in effect at the time services are rendered . . . ."

115. The coverage matrix in Plaintiff's Agreement contains various medical procedures and the corresponding reimbursement amounts and subscriber

payment responsibility. As an example, for Medical Emergencies in California, Plaintiff's Agreement states that, for a non-participating provider, the consumer, Plaintiff, must pay "All charges in excess of Customary and Reasonable charges." Like the other Agreements, Plaintiff's Agreement defines "Customary and Reasonable Charge" as a "charge which falls within the common range of fees billed by a majority of physicians for a procedure in a given geographic region."

116. WellPoint and Blue Cross of California make clear in their Agreements, as well as in other written communications with their plan members, that the plan member is financially responsible for the difference between the allowed expense and the provider's billed charge for ONS. For example, WellPoint's Agreements explicitly state that "You will be responsible for any billed charge which exceeds the customary and reasonable charge" for ONS. Once a member receives ONS, WellPoint and/or Blue Cross of California provide an explanation of benefits ("EOB") that describes the division of payment for the service. The EOBs state the amount the out-of-network provider charged for the service, the amount allowed, and after stating the percentage and portion of the amount allowed that WellPoint or Blue Cross of California will pay, states the balance, which the EOBs describe as "Your Responsibility."

117. The portions of ONS charges not paid by WellPoint or Blue Cross of California are not credited toward deductibles or out-of-pocket maximums that limit the total amount a plan member has to pay for medical services over a given time period. Thus, such costs are borne entirely by the plan members.

118. Beginning on or about January 23, 2009, Plaintiff began a series of outpatient medical visits with a Non-Participating Provider. Plaintiff submitted a claim with WellPoint and Blue Cross of California regarding these visits. WellPoint and Blue Cross of California made a reimbursement determination on Plaintiff's claim that reimbursed Plaintiff less than the agreed-upon percentage of either the provider's actual charges or the UCR. This reimbursement

determination resulted in Plaintiff being obligated to pay not only his deductible, but also that part of the provider's billed charge that exceeded the reimbursement amount as determined by WellPoint and Blue Cross of California.

119. In processing claims for ONS charges, WellPoint and Blue Cross of California are obligated by the terms of the Agreements to reimburse their plan members for ONS based on either the actual billed charge or the objective criteria for UCRs set forth in the Agreements. WellPoint and Blue Cross of California, however, fail to honor the terms of the Agreements by basing their reimbursements for ONS on the False UCRs.

120. Specifically, in making ONS reimbursements, WellPoint and Blue Cross of California use uniform pricing schedules provided twice yearly by Ingenix, a wholly-owned subsidiary of Defendant UHG, the nation's second largest health insurer (after WellPoint). Ingenix provides this information from a database it creates.

121. The Ingenix Database is inherently flawed and invalid in that it produces inaccurate uniform pricing schedules, which WellPoint, Blue Cross of California and their Co-Conspirators agree to use for fixing False UCRs and under-reimbursing for ONS. The flaws and errors in the Ingenix Database allow WellPoint, Blue Cross of California and their Co-Conspirators to reimburse for ONS at artificially low rates well below the UCR.

122. WellPoint and Blue Cross of California are major contributors of provider charge data to Ingenix. Prior to contributing its data to Ingenix, WellPoint and Blue Cross of California delete valid high charges and thereby do not submit a true range of charges. Following receipt of the data from WellPoint and Blue Cross of California, Ingenix further removes additional valid high charges from WellPoint, Blue Cross of California and all other contributors' data.

123. Ingenix updates its database and disseminates uniform pricing schedules to WellPoint, Blue Cross of California and their Co-Conspirators every

1 six months. Beginning as early as at least 1998, WellPoint, Blue Cross of
2 California and their Co-Conspirators used Ingenix pricing schedules to determine
3 reimbursement for ONS.

4     124. Plaintiff and the other members of the proposed Contract Damages
5 Class complied with their obligations under their Agreements with WellPoint
6 and/or Blue Cross of California.

7     125. Nevertheless, WellPoint and Blue Cross of California failed to comply
8 with the terms of their Agreements with Plaintiff and the other members of the
9 proposed Contract Damages Classes by making reimbursement determinations for
10 ONS that had the effect of covering less than the stated percentage of either the
11 providers' actual charges or the UCR without valid data to support such
12 determinations.

13     126. Rather than reimbursing for ONS based on either the actual charge or
14 the customary and reasonable charge for a particular service as promised in the
15 Agreements, WellPoint and Blue Cross of California reimbursed Plaintiff and the
16 other members of the Contract Damages Class based on the flawed and artificially
17 deflated data provided by Ingenix. WellPoint and Blue Cross of California's
18 conduct thus contravenes the express terms of the Agreements and constitutes a
19 breach of their contracts. Such conduct also prevents their members from
20 obtaining the benefits of the reimbursements they reasonably expect to receive
21 pursuant to the terms of the Agreements in violation of the covenant of good faith
22 and fair dealing.

23     127. Moreover, although Plaintiff and the other members of the Contract
24 Damages Class are contractually entitled to choose care for ONS, WellPoint and
25 Blue Cross of California inhibited the use of ONS providers by using False UCRs
26 that increased the unpaid amounts for which Plaintiff and the other members of the
27 Contract Damages Class were liable, thereby deterring their members' use of ONS.

28     128. As a consequence of WellPoint, Blue Cross of California and their

Co-Conspirator's actions, Plaintiff and the other members of the proposed Contract Damages Class were reimbursed for ONS in amounts less than what they should have been paid under their Agreements. WellPoint and Blue Cross of California pursued their standard and uniform policies in making reimbursement determinations for ONS in a fashion that conflicted with their contractual obligations under their Agreements and that violated their fiduciary duties to Plaintiff and the other members of the proposed Contract Damages Class.

129. WellPoint and Blue Cross of California also represent through their advertising, promotional pamphlets and plan contracts that they will permit their members to choose between in-network and out-of-network providers and that their members will be reimbursed for ONS based on either the actual billed cost or the UCR. Nevertheless, WellPoint and Blue Cross of California do not reimburse for ONS based on either the actual cost or the UCR, instead utilizing reimbursement rates that they know are artificially deflated. Based on WellPoint and Blue Cross of California's advertising and plan contracts, Plaintiff and the other members of the California Subclass reasonably believed that they would be reimbursed for ONS based on valid, objective criteria and that such criteria would result in reimbursements that reflected the actual costs of ONS in their area. By affirmatively misrepresenting the extent to which they will reimburse for ONS and the extent to which consumers can choose between in-network and out-of-network providers, by failing to disclose that reimbursement for ONS is calculated based on False UCRs, and by failing to disclose that the False UCRs are developed pursuant to a secret conspiracy amongst health insurers as described in detail above, WellPoint and Blue Cross of California have deceived Plaintiff and the other members of the California Subclass.

130. Plaintiff and the other members of the proposed California Subclass were reimbursed for ONS in amounts less than WellPoint and Blue Cross of California promised in their advertising and contracts.

## NEW YORK ATTORNEY GENERAL INVESTIGATION AND ACTION

131. During 2007 and 2008, the New York Attorney General received complaints that consumers did not understand how health insurers computed reimbursement rates for ONS and that questioned the amount of reimbursements they were receiving.

132. Accordingly, on February 13, 2008, the New York Attorney General "Healthcare Industry Taskforce" launched an industry-wide investigation into allegations that insurers were under-reimbursing for ONS. The investigation centered on Defendants and the Co-Conspirators, and particularly on Ingenix.

133. After six months of investigation that included document review, data analysis, and interviews, the New York Attorney General found that the Ingenix Database systematically reduces the rate at which insurers paid consumers or their physicians for out-of-network care. As a result, the New York Attorney General's office expanded its investigation by issuing subpoenas seeking documents from more than a dozen health insurers, including Defendants UHG and WellPoint as well as several of the Co-Conspirators.

134. The New York Attorney General found that those documents revealed a shocking lack of transparency and accuracy in the industry use of the Ingenix Database. The New York Attorney General found that insurers such as WellPoint obfuscate in their policy language by promising to reimburse based on usual and customary rates but instead reimbursing based on schedules compiled by one of their own: UHG via Ingenix.

135. The New York Attorney General further found that this conflict of interest is entirely hidden from consumers because Defendants and the Co-Conspirators pretend that an independent database underlies their UCRs for ONS when, in reality, the schedules themselves, created in a well of conflicts, are unreliable and inadequate. The end result is that consumers are "tricked" into

having to pay more for medical care than they had anticipated, leading to unexpected health care debts.

136. The New York Attorney General found that the health insurers, who have a financial incentive to do so, first provide flawed data and then receive flawed data to determine UCRs for ONS that are understated and artificially low. Or, as the head of the New York Attorney General's investigative task force stated, "garbage in, garbage out."

137. To test the accuracy of the Ingenix Database, the New York Attorney General's office collected and analyzed millions of health care bills from a variety of sources, including over a million bills from ordinary doctors' office visits within the state of New York. It then compared these actual bills to the UCRs produced by the Ingenix Database for that geographic area. This enabled the New York Attorney General's office to compare the rate that the Ingenix Database indicated *should* be paid for a particular medical service in a particular region with the rate that the doctors in that region actually charged. The comparison ultimately revealed that insurers systematically under-reimburse insureds for doctors' office visits, and that up to 110 million Americans have been harmed by Defendants' conspiracy to the tune of hundreds of millions of dollars in losses nationwide.

138. Upon completing its investigation, the New York Attorney General's office summarized its central findings in a January 13, 2009 document entitled "Health Care Report: The Consumer Reimbursement System is Code Blue" (the "NYAG Report").

139. The NYAG Report found that the Ingenix Database and the insurers' participation in and use of Ingenix was:

(a) "an industry-wide problem";

(b) "a *rigged system*";

(c) "fraudulent";

(d) advanced the interests of the insurers;

1        (e) "critically ill"; and

2        (f) operated as a "***black box***" to consumers, who are left in the dark

3 as to "what reimbursement rate to expect from the insurer."

4     140. Furthermore, the New York Attorney General left little doubt that this

5 industry-wide problem needed an industry-wide solution because all industry

6 members benefitted unfairly and at the expense of consumers for at least the past

7 ten years.

8     141. Following issuance of its Report, the New York Attorney General

9 entered into several "Assurances of Discontinuance" with UHG, WellPoint, and

10 certain of the Co-Conspirators named in this case (Cigna and Aetna).

11     142. Those assurances provided that:

12        (a) An independent third party free of conflicts that uses a fair,

13 objective and reliable database is needed;

14        (b) An independent database would be created and operated

15 through a not-for-profit corporation that will own the new database and collect data

16 from contributors and publish rate information in a public and transparent way;

17        (c) The not-for-profit corporation will create a website available to

18 the public to disclose out-of-network reimbursement rates. The website will

19 include a search function that will clearly indicate the prevailing charge in a given

20 area;

21        (d) Insurers will provide information to its members explaining the

22 method of determining reimbursement rates including that Ingenix is owned by

23 UHG, and will explain that a new database is being created;

24        (e) Insurers will contribute to fund the creation of the new

25 database. Defendant UHG agreed to pay $50 million; Defendant WellPoint agreed

26 to pay $10 million; Aetna agreed to pay $20 million; and Cigna to pay $10 million;

27 and

28     143. Once the new database is created, insurers have 60 days to cease

operating and using the Ingenix Database.

## CLASS ALLEGATIONS

144.   Plaintiff brings this action on behalf of himself and all others similarly situated, pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil Procedure.  Plaintiff seeks to represent the following Classes:

**Antitrust Damages Class**

> All persons or entities who paid premiums pursuant to a health plan administered by WellPoint or Blue Cross of California who obtained an out-of-network service that was partially reimbursed by WellPoint between January 1, 1998 and the present.

**Antitrust Injunctive Relief Class**

> All persons or entities who paid premiums pursuant to a health plan that includes out-of-network health insurance coverage and is administered by WellPoint or Blue Cross of California.

**Contract Damages Class**

> All persons who paid premiums pursuant to an individual and/or family health plan administered by WellPoint or Blue Cross of California who obtained an out-of-network service that was partially reimbursed by WellPoint or Blue Cross of California between January 1, 1998 and the present.

**California Subclass**

> All persons residing in California who paid premiums pursuant to an individual and/or family health plan administered by WellPoint or Blue Cross of California who obtained an out-of-network service that was partially reimbursed by WellPoint or Blue Cross of California between January 1, 1998 and the present.

145.   Excluded from each of the above Classes are the Court and its officers, employees and relatives, each Defendant and Co-Conspirator and any entity in which any Defendant or con-conspirator has a controlling interest, and their respective directors, officers, employees, and relatives; any governmental entities; and counsel for Plaintiff, including its partners, employees, and agents.

1    146.    The Antitrust Damages Class seeks compensatory damages against all

2    Defendants, as well as appropriate equitable and declaratory relief and treble

3    damages, under the Sherman Act.

4    147.    Each of the above Classes consists of thousands of individuals and

5    entities throughout the United States, making individual joinder impractical, in

6    satisfaction of Rule 23(a)(1). The disposition of the claims in each of the above

7    Classes in a single class action will provide substantial benefits to all parties and to

8    the Court.

9    148.    Plaintiff's claims are typical of the claims of in each of the above

10   Classes, as required by Rule 23(a)(3), in that the representative Plaintiff, like all

11   members of each of the above Classes, paid premiums for out-of-network health

12   insurance coverage from WellPoint or Blue Cross of California and/or received

13   reimbursement for out-of-network medical services that was based on a UCR

14   provided by Ingenix. Plaintiff, like all members of the above Classes and

15   Subclass, has been damaged by Defendants' and their Co-Conspirators'

16   misconduct because, among other things, he was misled as to the reimbursement

17   rates for out-of-network health insurance coverage he purchased from Wellpoint

18   and Blue Cross of California and has been under-reimbursed for out-of-network

19   medical expenses.

20   149.    The factual and legal bases of Defendants' and their Co-Conspirators'

21   misconduct are common to the members of each of the above Classes and Subclass

22   and represent a common thread of misconduct resulting in injury to Plaintiff and

23   members of the each of the above Classes and Subclass.

24   150.    There are many questions of law and fact common to Plaintiff and

25   each of the above Classes and Subclass, and those questions predominate over any

26   questions that may affect individuals in each of the above Classes and Subclass,

27   within the meaning of and fulfilling Rules 23(a)(2) and 23(b)(3). Common

28   questions of law and fact include, but are not limited to, the following:

(a) whether Defendants and their Co-Conspirators engaged in a deceptive scheme of improperly manipulating and/or using improperly manipulated UCRs that were used as the basis for out-of-network reimbursement;

(b) whether Defendants and their Co-Conspirators artificially lowered reimbursements for out-of-network medical services;

(c) whether it was the policy and practice of Defendants and their Co-Conspirators to prepare marketing and sales materials that contained false and misleading information regarding the extent of out-of-network coverage provided under their plans;

(d) whether Defendants and their Co-Conspirators engaged in a pattern and practice that caused Plaintiff and members of the Classes to incur excessive out-of-pocket expenses under their plans;

(e) whether Defendants and their Co-Conspirators engaged in a pattern of deceptive conduct as to Plaintiff and the members of the Classes;

(f) whether Defendants and their Co-Conspirators engaged in a contract, combination or conspiracy to fix UCRs;

(g) the duration and extent of the combination or conspiracy alleged herein;

(h) whether the alleged combination and conspiracy violated Section 1 of the Sherman Act;

(i) whether the Agreements for all Wellpoint and Blue Cross of California's individual and family health plans utilize the same uniform definitions for UCRs for ONS;

(j) whether WellPoint and Blue Cross of California's use of the Ingenix Database to calculate UCRs for ONS breaches their contractual obligations to their plan members in its health plans;

(k) whether WellPoint and Blue Cross of California's use of the Ingenix Database to calculate UCRs for ONS contravenes the reasonable

expectations of their plan members such as to violate the covenant of good faith and fair dealing.

(l) whether Defendants' conspiracy to depress reimbursement rates for ONS violates California's Unfair Competition Laws;

(m) whether health care costs and the flexibility to choose medical providers are material to consumers;

(n) whether Defendants misrepresented the extent to which they would reimburse their plan members for the costs of ONS;

(o) whether Defendants omitted material information regarding the manner in which they calculate reimbursements for ONS and regarding the extent to which they will provide such reimbursements;

(p) whether Plaintiff and the other members of the above Classes and Subclass have all suffered harm and damages as a result of the unlawful and wrongful conduct alleged herein; and

(q) whether Plaintiff and the other members of the above Classes and Subclass are entitled to the relief sought herein.

151. Plaintiff will fairly and adequately represent and protect the interests of the above Classes and Subclass, as required by Rule 23(a)(4). Plaintiff has retained counsel with substantial experience in prosecuting nationwide consumer class actions. Plaintiff and his counsel are committed to vigorously prosecuting this action on behalf of the Classes and Subclass, and have the financial resources to do so. Neither Plaintiff nor his counsel has any interest adverse to those of the Classes and Subclass.

152. Plaintiff and members of the above Classes and Subclass have all suffered, and will continue to suffer, harm and damages as a result of the unlawful and wrongful conduct alleged herein. A class action is superior to other available methods for the fair and efficient adjudication of this controversy under Rule 23(b)(3). Absent a class action, most members of the above Classes and Subclass

likely would find the cost of litigating their claims to be prohibitive, and would
have no effective remedy at law. The class treatment of common questions of law
and fact is also superior to multiple individual actions or piecemeal litigation in
that it conserves the resources of the Courts and the litigants, and promotes
consistency and efficiency of adjudication. Additionally, Defendants and their Co-
Conspirators have acted and failed to act on grounds generally applicable to
Plaintiff and the above Classes and Subclass. Therefore, Court imposition of
uniform relief is required to ensure compatible standards of conduct toward the
above Classes, thereby making appropriate equitable relief to the above Classes
and Subclass as a whole within the meaning of Rules 23(b)(1) and (b)(2).

## FRAUDULENT CONCEALMENT

153. Each Defendant and Co-Conspirator concealed its fraudulent conduct
from Plaintiff and the members of the Classes and Subclass by conspiring to
manipulate the process by which reimbursement rates were set. Defendants and
their Co-Conspirators also prevented Plaintiff and the members of the Classes and
Subclass from knowing or discovering the actual methodology used by Ingenix to
determine the False UCRs. Moreover, the fraudulent conduct alleged herein was
of such a nature as to be self-concealing.

154. Each Defendant's and the Co-Conspirators' efforts to conceal its
source and methodology of determining the False UCRs indicate that it knew that
its conduct was fraudulent.

155. Thus, each Defendant and Co-Conspirator participated in the Ingenix
scheme by concealing that it was providing flawed data to Ingenix and/or knew the
methodology used by Ingenix to calculate False UCRs was inherently flawed. As
a result, each Defendant and Co-Conspirator knew that the False UCRs it used to
set its reimbursement rates were lower than the actual costs of medical services.

156. Plaintiff was diligent in pursuing an investigation of the claims
asserted in this Complaint. Through no fault of his own, he did not receive inquiry

notice nor learn of the factual basis for his claims in this Complaint and the injuries suffered until the recent disclosures in the press and media in February 2008.

## TOLLING OF APPLICABLE STATUTES OF LIMITATION

157. Any applicable statutes of limitations have been tolled by Defendants' and their Co-Conspirators' knowing and active concealment and denial of the facts alleged herein. Plaintiff and members of the Classes have been kept in ignorance of vital information essential to knowledge of and the pursuit of these claims, without any fault or lack of diligence on their part. Plaintiff and members of the Classes could not reasonably have discovered the fraudulent scheme to manipulate the reimbursement rates paid by Defendants and their Co-Conspirators to insureds for out-of-network claims.

158. Defendants and their Co-Conspirators were, and continue to be, under a continuing duty to disclose to Plaintiff and the Classes the fact that their reimbursement rates for out-of-network medical expenses were based on False UCRs that bore, and continue to bear, no relationship to the actual charges for those medical expenses. Because of their knowing, affirmative, and/or active concealment of the fraudulent nature of the False UCRs, Defendants and their Co-Conspirators are estopped from relying on any statutes of limitations.

### FIRST CLAIM FOR RELIEF

**VIOLATION OF SECTION 1 OF
THE SHERMAN ANTITRUST ACT
15 U.S.C. § 1
(Against All Defendants on behalf of
Antitrust Damages and Injunctive
Relief Classes)**

159. Plaintiff incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint. Plaintiff brings this claim on behalf of the Antitrust Damages and Injunctive Relief Classes.

160. From a date unknown, but beginning at least as early as January 1, 1998, and continuing through the present, Defendants and their Co-Conspirators

have combined, conspired and/or contracted to restrain interstate trade in violation of 15 U.S.C. § 1.

161. The combination or conspiracy alleged in this Complaint consisted of a continuing agreement, understanding or concert of action by the Defendants and their other Co-Conspirators, the substantial terms of which were to create, maintain and use the Ingenix Database to produce artificially low UCRs for reimbursement of ONS.

162. The conspiracy was intended to directly affect the end payors of the medical services covered by out-of-network insurance plans. The intent, purpose and effect of the conspiracy was to cause under-reimbursement for medical services, and thereby minimize reimbursement payments made on such claims among Defendants and their Co-Conspirators.

163. Through the conspiracy, Defendants and their Co-Conspirators have in fact caused a decrease in reimbursement or payments for out-of-network medical services but for their anticompetitive conduct.

164. As the result of the wrongful conduct alleged herein, Plaintiff and the Antitrust Damages Class paid higher out-of-pocket payments for out-of-network medical services than they would have paid but for Defendants' and their Co-Conspirators' anticompetitive conduct, have been injured in their business or property, and have suffered damages in an amount to be determined at trial.

165. The conduct of Defendants and their Co-Conspirators constitutes a violation of § 1 of the Sherman Act, 15 U.S.C. § 1. Plaintiff and the Antitrust Damages Class are entitled to recover all damages and treble damages allowed under § 1 of the Sherman Act against Defendants, jointly and severally, together with their costs of suit, including reasonable attorneys' fees, as well as any necessary injunctions to bar or abate Defendants' anticompetitive acts.

Wherefore, Plaintiff prays judgment against Defendants, as set forth hereafter.

## SECOND CLAIM FOR RELIEF

### BREACH OF CONTRACT
**(Against Defendants Wellpoint and
Blue Cross of California On behalf of
Contract Damages Class)**

166.    Plaintiff incorporates herein by reference each of the allegations

contained in the preceding paragraphs of this Complaint.  Plaintiff brings this claim

on behalf of the Contract Damages Class.

167.    The Agreement constitutes a contract whereby plaintiff and members

of the Contract Damages Class agree to pay dues, deductibles, and co-payments,

on one hand, and WellPoint and Blue Cross of California agree to provide health

care benefits, including reimbursements for ONS based on either the actual charges

or the customary rates charged by healthcare professionals in the region where the

ONS was obtained, on the other hand.

168.    Plaintiff and members of the Contract Damages Class performed their

obligations under the Agreement.  Nevertheless, WellPoint and Blue Cross of

California unjustifiably breached the Agreement by failing to reimburse ONS

based on the UCR, instead using the flawed and depressed rate information

obtained from Ingenix.

169.    Plaintiff and the Contract Damages Class were damaged by WellPoint

and Blue Cross of California's breach of the Agreement in that their out of pocket

costs for ONS were increased and/or their deductibles were not paid down as

quickly as they should have been as a direct result of WellPoint and Blue Cross of

California's breach.  Plaintiff and the Contract Damages Class are therefore

entitled to damages according to proof at trial.

Wherefore, Plaintiff prays judgment against Defendants, as set forth

hereafter.

## THIRD CLAIM FOR RELIEF

### BREACH OF IMPLIED COVENANT OF GOOD FAITH AND FAIR DEALING

#### (Against Defendants WellPoint and Blue Cross of California On behalf of Contract Damages Class)

170. Plaintiff incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint. Plaintiff brings this claim on behalf of the Contract Damages Class.

171. Plaintiff is informed and believes and thereon alleges that since at least 1998 and continuing thereafter through the present, WellPoint and Blue Cross of California have been calculating UCRs based on the flawed data obtained from Ingenix resulting in their failure to reimburse ONS in accordance with the terms of their Agreements.

172. WellPoint and Blue Cross of California utilized the flawed data thereby under-reimbursing their members in order to obtain additional revenues to unlawfully enrich WellPoint and Blue Cross of California to the detriment of Plaintiff and the other members of the Contract Damages Class.

173. Plaintiff and members of the Contract Damages Class purchased the health service plans with the reasonable expectation that they would be reimbursed for ONS based upon the actual charge or the reasonable charge for the particular healthcare service in the region where that service is obtained.

174. In addition, Plaintiff and members of the Class purchased the health services plans with the reasonable expectation that WellPoint and Blue Cross of California would deal with them honestly, fairly, equitably, in good faith and in full conformity with the fundamental and implied terms of the Agreements. WellPoint and Blue Cross of California brought about and intended this expectation through the contractual language in the Agreements, through their advertising, and through the express representations of their employees, agents and

representatives.

175.  In breach of the covenant of good faith and fair dealing, WellPoint and Blue Cross of California have failed to reimburse ONS based on actual UCRs and have not provided any additional benefits to Plaintiff and the Contract Damages Class for the increased charges resulting from their under-reimbursement for ONS.  Therefore, WellPoint and Blue Cross of California have unreasonably denied Class members the benefit of their bargain.

176.  WellPoint and Blue Cross of California have materially and fundamentally breached the duty of good faith and fair dealing owed to Plaintiff and the Contract Damages Class in at least the following respects:

(a)  Unreasonably, secretly, and in bad faith conspiring to utilize flawed data to calculate depressed UCRs and under-reimburse plan members for ONS in order to unlawfully enrich themselves;

(b)  Unreasonably and in bad faith failing to clearly and definitely notify Plaintiff and the Contract Damages Class of the fact that WellPoint and Blue Cross of California utilize flawed data to calculate False UCRs, which results in higher payments for ONS;

(c)  Unreasonably and in bad faith continuing to misrepresent to Plaintiff and the Contract Damages Class that they were being reimbursed for ONS based on the UCR when WellPoint and Blue Cross of California continue to utilize flawed Ingenix data to calculate False UCRs;

(d)  Unreasonably, secretly, and in bad faith providing intentionally flawed and manipulated data to Ingenix for use in the Ingenix Database with the knowledge that such data would produce artificially low False UCRs from Ingenix; and

(e)  Unreasonably and in bad faith putting the interests of WellPoint and Blue Cross of California ahead of those of Plaintiff and the Contract Damages Class.

1  177.  WellPoint and Blue Cross of California's conduct represents a failure
2  or refusal to discharge their contractual responsibilities, prompted by a conscious
3  and deliberate act, which unfairly frustrates the agreed common purposes and
4  disappoints the reasonable expectations of Plaintiff and the Contract Damages
5  Class and thereby deprives Plaintiff and the Contract Damages Class of the
6  benefits of the Agreement in accordance with the agreed-upon terms.

7  178.  Plaintiff and the Contract Damages Class performed their obligations
8  under the Agreement by paying WellPoint and Blue Cross of California the dues,
9  deductibles, and co-payments required by the Agreement.

10  179.  Plaintiff and the Contract Damages Class were damaged by WellPoint
11  and Blue Cross of California's breach of the covenant of good faith and fair
12  dealing in that they were under-reimbursed for ONS thereby resulting in increased
13  out of pocket costs and/or they were unable to pay down their deductibles as
14  quickly as they should have, and are therefore entitled to damages according to
15  proof at trial.

16  Wherefore, Plaintiff prays judgment against Defendants, as set forth
17  hereafter.

## FOURTH CLAIM FOR RELIEF

### FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE § 17200, *et seq.* UNLAWFUL BUSINESS PRACTICES
### (Against All Defendants on behalf of California Subclass)

22  180.  Plaintiff incorporates herein by reference each of the allegations
23  contained in the preceding paragraphs of this Complaint.  Plaintiff brings this claim
24  on behalf of the California Subclass.

25  181.  The Unfair Competition Law ("UCL"), Business and Professions
26  Code § 17200, *et seq.*, defines unfair competition to include any unlawful business
27  act or practice.

28  182.  Beginning on an exact date unknown to Plaintiff, but at least

- 49 -

beginning in 1998 and continuing to the present day, Defendants have committed
acts of unfair competition proscribed by Business and Professions Code § 17200,
*et seq.*, including the acts and practices alleged herein.

183. Defendants have engaged in unfair business practices by violating § 1
of the Sherman Act, 15 U.S.C. § 1.

184. Defendants have engaged in unfair business practices by entering into
a trust that impairs competition in violation of California's Cartwright Act,
Business and Professions Code § 16700, *et seq.*

185. Defendants have engaged in unfair business practices by failing to
reimburse for ONS based on the actual price or the UCR as promised in their
Agreements. Such conduct is unlawful as a breach of contract and a breach of the
implied covenant of good faith and fair dealing found in insurance agreements.
Such conduct represents a failure or refusal to discharge their contractual
responsibilities, prompted by a conscious and deliberate act, which unfairly
frustrates the agreed common purposes and disappoints the reasonable expectations
of the policyholders and thereby deprives the policyholders of the benefits of the
agreement according to the agreed-upon terms. For their part, the policyholders
have fully performed and are entitled to full performance by Defendants. The
policyholders have suffered losses including the over-payment for ONS due to
under-reimbursement by Defendants and due to their unlawful and secret
conspiracy.

186. Defendants' business acts and practices also constitute unlawful
business practices in that Defendants have advertised their health service plans in a
manner that is untrue or misleading with an intent to induce Plaintiff and the other
members of the California Subclass to enter a health services agreement, in
violation of Business and Professions Code § 17500.

187. By committing the acts alleged above, Defendants have engaged in
unlawful business practices which constitute unfair competition within the

meaning of Business and Professions Code § 17200.

188.   Plaintiff and the other members of the California Subclass have suffered injury in fact and lost money or property as a result of Defendants' acts of unfair competition.  Among other things, Plaintiff and the other members of the California Subclass have been forced to pay out of pocket costs for ONS due to Defendants' under-reimbursement for ONS as a result of Defendants' conduct alleged herein.

189.   Defendants hold, retain and have derived benefits from money properly belonging to Plaintiff and the California Subclass.

190.   Defendants' unfair business acts and practices described herein present a continuing threat to the California Subclass in that Defendants are currently engaging in such acts and practices, and will persist and continue to do so unless and until this Court issues appropriate injunctive and declaratory relief.

191.   An action for injunctive relief and restitution is specifically authorized under Business and Professions Code § 17203.

Wherefore, Plaintiff prays judgment against Defendants, as set forth hereafter.

## FIFTH CLAIM FOR RELIEF

**VIOLATIONS OF THE UNFAIR COMPETITION LAW, BUSINESS AND PROFESSIONS CODE § 17200, *et seq.* FRAUDULENT BUSINESS PRACTICES (Against All Defendants on behalf of California Subclass)**

192.   Plaintiff incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint.  Plaintiff brings this claim on behalf of the California Subclass.

193.   Defendants' business acts and practices described herein also constitute fraudulent business practices in that said acts and practices are likely to deceive, and in fact have deceived Plaintiff the California Subclass.

194.   Defendants advertise, promote and sell their health plans based on

widely disseminated and uniform representations on their website and other
standard promotional materials that their members will have the right to freely
choose between in-network and out-of-network providers and that ONS will be
reimbursed based on the actual billed cost or based on UCRs. In reliance upon
these materials, Plaintiff and the California Subclass subscribed to Wellpoint
and/or Blue Cross of California healthcare plans with the reasonable understanding
and belief that they would have a free choice of providers and that they would be
reimbursed for ONS based on the actual billed cost or based on UCRs. Overall
out-of-pocket costs of healthcare, including the cost of ONS, and choice of
providers are extremely important to Plaintiff and the other members of the
California Subclass. Defendants nevertheless do not use actual costs or UCRs to
calculate ONS, but rather, use the False UCRs obtained from Ingenix to calculate
reimbursements for ONS. By using the False UCRs as a basis for reimbursing
Plaintiff and the other California Subclass members, Defendants increased their
out-of-pocket costs for ONS and deterred them from freely choosing between in-
network and out-of-network providers.

195. Defendants' fraudulent business acts and practices present a
continuing threat to the California Subclass in that Defendants are currently
engaging in such acts and practices, and will persist and continue to do so unless
and until this Court issues appropriate injunctive and declaratory relief.

196. Plaintiff and the California Subclass have suffered injury in fact and
lost money or property as a result of Defendants' acts of unfair competition.
Among other things, Plaintiff and the other members of the California Subclass
have been forced to pay higher out of pocket costs for ONS as a result of
Defendants' conduct alleged herein.

197. Defendants retain, and have derived benefits from money properly
belonging to Plaintiff and the California Subclass.

198. An action for injunctive relief and restitution is specifically authorized

under Business and Professions Code § 17203.

Wherefore, Plaintiff prays judgment against Defendants, as set forth hereafter.

## SIXTH CLAIM FOR RELIEF

**FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW,
BUSINESS AND PROFESSIONS CODE § 17200, *et seq.*
UNFAIR BUSINESS PRACTICES
(Against All Defendants on behalf of California Subclass)**

199.    Plaintiff incorporates herein by reference each of the allegations contained in the preceding paragraphs of this Complaint. Plaintiff brings this claim on behalf of the California Subclass.

200.    Under Business & Professions Code § 17200, any business act or practice that is unethical, oppressive, unscrupulous and/or substantially injurious to consumers, or that violates a legislatively declared policy, constitutes an unfair business act or practice.

201.    Defendants have engaged, and continue to engage, in conduct which is immoral, unethical, oppressive, unscrupulous and/or substantially injurious to consumers. This conduct includes, but is not limited to using flawed data to calculate False UCRs in order to under-reimburse plan members for ONS, while misrepresenting that the UCRs are actual and that plan members are being properly reimbursed. The gravity of harm caused by Defendants' conduct as described herein far outweighs the utility, if any, of such conduct.

202.    Defendants have engaged, and continue to engage, in conduct which violates the legislatively declared policy of the Sherman Act, 15 U.S.C. § 1, against conspiracies to restrain interstate trade.

203.    Defendants have engaged, and continue to engage, in conduct which violates the legislatively declared policy of California's Cartwright Act, California's Cartwright Act, Business and Professions Code § 16700, *et seq.*, against trusts that impair competition.

1  204.  By committing the acts alleged above, Defendants have engaged in

2  unfair business acts and practices which constitute unfair competition within the

3  meaning of Business & Professions Code § 17200.

4  205.  Plaintiff and the California Subclass have suffered injury in fact and

5  lost money or property as a result of Defendants' acts of unfair competition.

6  Among other things, Plaintiff and the other members of the California Subclass

7  have been forced to pay higher out of pocket costs for ONS as a result of

8  Defendants' conduct alleged herein.

9  206.  Defendants hold, retain and have derived benefits from money

10  properly belonging to Plaintiff and the California Subclass.

11  207.  Defendants' unfair business acts and practices described herein

12  present a continuing threat to the California Subclass in that Defendants are

13  currently engaging in such acts and practices, and will persist and continue to do so

14  unless and until this Court issues appropriate injunctive and declaratory relief.

15  208.  An action for injunctive relief and restitution is specifically authorized

16  under Business & Professions Code § 17203.

17  Wherefore, Plaintiff prays judgment against Defendants, as set forth

18  hereafter.

## SEVENTH CLAIM FOR RELIEF

**FOR VIOLATIONS OF THE UNFAIR COMPETITION LAW,
BUSINESS AND PROFESSIONS CODE § 17500, *et seq.*
FALSE ADVERTISING
(Against All Defendants on behalf of California Subclass)**

23  209.  Plaintiff incorporates herein by reference each of the allegations

24  contained in the preceding paragraphs of this Complaint.  Plaintiff brings this claim

25  on behalf of the California Subclass.

26  210.  Business & Professions Code § 17500 provides that it is unlawful for

27  any corporation to knowingly make, by means of any advertising device or

28  otherwise, any untrue or misleading statement with the intent to sell anything of

- 54 -

any nature, or to induce the public to purchase anything of any nature. Defendants' advertising described herein is likely to deceive, and in fact has deceived Plaintiff and the California Subclass in violation of Business & Professions Code § 17500.

211. Defendants have disseminated, and continue to disseminate advertising, that they know or should reasonably know is false and misleading.

212. Defendants advertise, promote and sell their health plans based on widely disseminated and uniform representations on their website and other standard form promotional materials that ONS will be reimbursed based on the actual billed cost or based on UCRs. Defendants nevertheless do not use either actual costs or UCRs to calculate ONS, but rather, use the False UCRs obtained from Ingenix to calculate reimbursements for ONS.

213. By committing the acts alleged above, Defendants have knowingly disseminated untrue and/or misleading statements in an advertising or other device in order to sell or induce members of the public to purchase their health benefit plans, in violation of Business & Professions Code § 17500.

214. Plaintiff and the California Subclass have suffered injury in fact and lost money or property as a result of Defendants' false and misleading statements. Among other things, Plaintiff and the other members of the California Subclass have been forced to pay higher out of pocket costs for ONS as a result of Defendants' conduct alleged herein.

215. Defendants hold, retain and have derived benefits from money properly belonging to Plaintiff and the California Subclass.

216. Defendants' unfair and misleading business acts and practices described herein present a continuing threat to the California Subclass in that Defendants are currently engaging in such acts and practices, and will persist and continue to do so unless and until this Court issues appropriate injunctive and declaratory relief.

1  217.  An action for injunctive relief and restitution is specifically authorized

2  for violations of Business & Professions Code § 17500, *et seq.*, under Business &

3  Professions Code § 17535.  Business & Professions Code § 17534.5 provides that

4  "the remedies or penalties provided by this chapter are cumulative to each other

5  and to the remedies or penalties available under all other laws of this state."

6  Wherefore, Plaintiff prays judgment against Defendants, as set forth

7  hereafter.

8  **PRAYER FOR RELIEF**

9  WHEREFORE, Plaintiff prays as follows:

10  A.  The Court determine that this action may be maintained as a class

11  action pursuant to Rule 23(a), (b)(2) and (b)(3) of the Federal Rules of Civil

12  Procedure and declare Plaintiff as representative of the Classes and his counsel as

13  counsel for those Classes;

14  B.  The Court determine the conduct alleged herein be unlawful;

15  C.  The Court enjoin Defendants from continuing the unlawful activities

16  alleged herein;

17  D.  The Court order WellPoint to recalculate and issue unpaid benefits to

18  Plaintiff and members of the Classes that were underpaid as a result of Defendants'

19  unlawful activities alleged herein;

20  E.  The Court declare that Defendants Wellpoint and Blue Cross of

21  California breached the terms of their Agreements and award unpaid benefits to

22  Plaintiff and the Contract Damages Class;

23  F.  The Court award injunctive and declaratory relief to prevent

24  Defendants' undisclosed and unauthorized scheme;

25  G.  The Court award Plaintiff and the Classes monetary damages as

26  provided for under law, including any trebling or special damages allowable

27  under law;

28  H.  The Court award Plaintiff and the California Subclass restitution as

provided for under law;

I.     The Court award Plaintiff and the Classes their costs of suit, including reasonable attorneys' fees, experts' fees and all other expenses as provided by law;

J.     The Court award pre and post judgment interest; and

K.     The Court grant such other and further relief as is just and proper.

**DEMAND FOR JURY TRIAL**

Plaintiff demands a jury trial in all issues so triable.


DATED: April 9, 2009                    LEXINGTON LAW GROUP, LLP

                                        _____
                                        Mark N. Todzo (State Bar No. 168389)
                                        Lisa Burger (State Bar No. 239676)
                                        LEXINGTON LAW GROUP, LLP
                                        1627 Irving Street
                                        San Francisco, CA  94122
                                        Telephone: (415) 759-4111
                                        Facsimile: (415) 759-4112

                                        Counsel for Plaintiff J.B.W.,
                                        a minor, by and through Julz W.,
                                        parent and guardian ad litem

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

### NOTICE OF ASSIGNMENT TO UNITED STATES MAGISTRATE JUDGE FOR DISCOVERY

This case has been assigned to District Judge Otis D. Wright II and the assigned discovery Magistrate Judge is Fernando M. Olguin.

The case number on all documents filed with the Court should read as follows:

## CV09- 2488 ODW (FMOx)

Pursuant to General Order 05-07 of the United States District Court for the Central District of California, the Magistrate Judge has been designated to hear discovery related motions.

All discovery related motions should be noticed on the calendar of the Magistrate Judge

=================================================

**NOTICE TO COUNSEL**

*A copy of this notice must be served with the summons and complaint on all defendants (if a removal action is filed, a copy of this notice must be served on all plaintiffs).*

Subsequent documents must be filed at the following location:

| [X] Western Division | [ ] Southern Division | [ ] Eastern Division |
|---|---|---|
| 312 N. Spring St., Rm. G-8 | 411 West Fourth St., Rm. 1-053 | 3470 Twelfth St., Rm. 134 |
| Los Angeles, CA 90012 | Santa Ana, CA 92701-4516 | Riverside, CA 92501 |

Failure to file at the proper location will result in your documents being returned to you.

LEXINGTON LAW GROUP LLP
Mark N. Todzo, State Bar No. 168389
Lisa M. Burger, State bar No. 239676
1627 Irving Street
San Francisco, CA 94122
Telephone: (415) 759-4111

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| J.B.W. (A minor, by and through Julz W., parent and guardian ad litem) on Behalf of Himself and All Others Similarly Situated, <br><br> PLAINTIFF(S) <br><br> v. <br><br> UNITEDHEALTH GROUP, INC., INGENIX, INC., WELLPOINT, INC. and BLUE CROSS OF CALIFORNIA, <br><br> DEFENDANT(S). | CASE NUMBER <br><br> **CV 09-02488 ODW**    **FMOx** <br><br><br> **SUMMONS** |

TO: DEFENDANT(S): _____

A lawsuit has been filed against you.

Within **20** days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, **Mark N. Todzo**, whose address is **1627 Irving Street, San Francisco, CA 94122**. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

Dated: **APR 1 0 2009**

By: _____
Deputy Clerk

*(Seal of the Court)*

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

LEXINGTON LAW GROUP LLP
Mark N. Todzo, State Bar No. 168389
Lisa M. Burger, State bar No. 239676
1627 Irving Street
San Francisco, CA 94122
Telephone: (415) 759-4111

# UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF CALIFORNIA

J.B.W. (A minor, by and through Julz W., parent and guardian ad litem) on Behalf of Himself and All Others Similarly Situated,

PLAINTIFF(S)

v.

UNITEDHEALTH GROUP, INC., INGENIX, INC., WELLPOINT, INC. and BLUE CROSS OF CALIFORNIA,

DEFENDANT(S).

CASE NUMBER

**CV09-02488 ODW** FMOx

**SUMMONS**

TO: DEFENDANT(S): _____

A lawsuit has been filed against you.

Within 20 days after service of this summons on you (not counting the day you received it), you must serve on the plaintiff an answer to the attached ☐ complaint ☐ _____ amended complaint ☐ counterclaim ☐ cross-claim or a motion under Rule 12 of the Federal Rules of Civil Procedure. The answer or motion must be served on the plaintiff's attorney, Mark N. Todzo _____, whose address is 1627 Irving Street, San Francisco, CA 94122 _____. If you fail to do so, judgment by default will be entered against you for the relief demanded in the complaint. You also must file your answer or motion with the court.

Clerk, U.S. District Court

**LA'REE HORN**

Dated: APR 1 0 2009

By: _____

Deputy Clerk

(Seal of the Court)

1192

*[Use 60 days if the defendant is the United States or a United States agency, or is an officer or employee of the United States. Allowed 60 days by Rule 12(a)(3)].*

CV-01A (12/07)                    SUMMONS



# COPY

## UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
### CIVIL COVER SHEET

**I (a) PLAINTIFFS** (Check box if you are representing yourself ☐)
J. B. W. (a minor, by and through Julz W., parent and guardian ad litem) on Behalf of Himself and All Others Similarly Situated

**DEFENDANTS**
UNITEDHEALTH GROUP, INC., INGENIX, INC., WELLPOINT, INC. and BLUE CROSS OF CALIFORNIA

**(b)** Attorneys (Firm Name, Address and Telephone Number. If you are representing yourself, provide same.)

LEXINGTON LAW GROUP, LLP
1627 Irving Street, San Francisco, CA 94122, Telephone: (415) 759-4111
Attorneys: Mark N. Todzo (SBN 168389), Lisa M. Burger (SBN 239676)

Attorneys (If Known)

---

**II. BASIS OF JURISDICTION** (Place an X in one box only.)

☐ 1 U.S. Government Plaintiff  ☒ 3 Federal Question (U.S. Government Not a Party)

☐ 2 U.S. Government Defendant  ☒ 4 Diversity (Indicate Citizenship of Parties in Item III)

**III. CITIZENSHIP OF PRINCIPAL PARTIES** - For Diversity Cases Only
(Place an X in one box for plaintiff and one for defendant.)

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☐ 1 | Incorporated or Principal Place of Business in this State | ☐ 4 | ☒ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☒ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

---

**IV. ORIGIN** (Place an X in one box only.)

☒ 1 Original Proceeding  ☐ 2 Removed from State Court  ☐ 3 Remanded from Appellate Court  ☐ 4 Reinstated or Reopened  ☐ 5 Transferred from another district (specify):  ☐ 6 Multi-District Litigation  ☐ 7 Appeal to District Judge from Magistrate Judge

**V. REQUESTED IN COMPLAINT: JURY DEMAND:** ☒ Yes ☐ No (Check 'Yes' only if demanded in complaint.)

**CLASS ACTION under F.R.C.P. 23:** ☒ Yes ☐ No  ☒ MONEY DEMANDED IN COMPLAINT: $ damages, relief according to proof

**VI. CAUSE OF ACTION** (Cite the U.S. Civil Statute under which you are filing and write a brief statement of cause. Do not cite jurisdictional statutes unless diversity.)
15 U.S.C. § 1 (The Sherman Antitrust Act)

**VII. NATURE OF SUIT** (Place an X in one box only.)

| OTHER STATUTES | CONTRACT | TORTS PERSONAL INJURY | TORTS PERSONAL PROPERTY | PRISONER PETITIONS | LABOR |
|---|---|---|---|---|---|
| ☐ 400 State Reapportionment | ☐ 110 Insurance | ☐ 310 Airplane | ☐ 370 Other Fraud | ☐ 510 Motions to Vacate Sentence Habeas Corpus | ☐ 710 Fair Labor Standards Act |
| ☒ 410 Antitrust | ☐ 120 Marine | ☐ 315 Airplane Product Liability | ☐ 371 Truth in Lending | | ☐ 720 Labor/Mgmt. Relations |
| ☐ 430 Banks and Banking | ☐ 130 Miller Act | ☐ 320 Assault, Libel & Slander | ☐ 380 Other Personal Property Damage | ☐ 530 General | ☐ 730 Labor/Mgmt. Reporting & Disclosure Act |
| ☐ 450 Commerce/ICC Rates/etc. | ☐ 140 Negotiable Instrument | ☐ 330 Fed. Employers' Liability | ☐ 385 Property Damage Product Liability | ☐ 535 Death Penalty | ☐ 740 Railway Labor Act |
| ☐ 460 Deportation | ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 340 Marine | BANKRUPTCY | ☐ 540 Mandamus/ Other | ☐ 790 Other Labor Litigation |
| ☐ 470 Racketeer Influenced and Corrupt Organizations | ☐ 151 Medicare Act | ☐ 345 Marine Product Liability | ☐ 422 Appeal 28 USC 158 | ☐ 550 Civil Rights | ☐ 791 Empl. Ret. Inc. Security Act |
| ☐ 480 Consumer Credit | ☐ 152 Recovery of Defaulted Student Loan (Excl. Veterans) | ☐ 350 Motor Vehicle | ☐ 423 Withdrawal 28 USC 157 | ☐ 555 Prison Condition | PROPERTY RIGHTS |
| ☐ 490 Cable/Sat TV | | ☐ 355 Motor Vehicle Product Liability | CIVIL RIGHTS | FORFEITURE/ PENALTY | ☐ 820 Copyrights |
| ☐ 810 Selective Service | ☐ 153 Recovery of Overpayment of Veteran's Benefits | ☐ 360 Other Personal Injury | ☐ 441 Voting | ☐ 610 Agriculture | ☐ 830 Patent |
| ☐ 850 Securities/Commodities/ Exchange | ☐ 160 Stockholders' Suits | ☐ 362 Personal Injury-Med Malpractice | ☐ 442 Employment | ☐ 620 Other Food & Drug | ☐ 840 Trademark |
| ☐ 875 Customer Challenge 12 USC 3410 | ☐ 190 Other Contract | ☐ 365 Personal Injury-Product Liability | ☐ 443 Housing/Acco-mmodations | ☐ 625 Drug Related Seizure of Property 21 USC 881 | SOCIAL SECURITY |
| ☐ 890 Other Statutory Actions | ☐ 195 Contract Product Liability | ☐ 368 Asbestos Personal Injury Product Liability | ☐ 444 Welfare | ☐ 630 Liquor Laws | ☐ 861 HIA (1395ff) |
| ☐ 891 Agricultural Act | ☐ 196 Franchise | IMMIGRATION | ☐ 445 American with Disabilities - Employment | ☐ 640 R.R. & Truck | ☐ 862 Black Lung (923) |
| ☐ 892 Economic Stabilization Act | REAL PROPERTY | ☐ 462 Naturalization Application | ☐ 446 American with Disabilities - Other | ☐ 650 Airline Regs | ☐ 863 DIWC/DIWW (405(g)) |
| ☐ 893 Environmental Matters | ☐ 210 Land Condemnation | ☐ 463 Habeas Corpus-Alien Detainee | ☐ 440 Other Civil Rights | ☐ 660 Occupational Safety /Health | ☐ 864 SSID Title XVI |
| ☐ 894 Energy Allocation Act | ☐ 220 Foreclosure | ☐ 465 Other Immigration Actions | | ☐ 690 Other | ☐ 865 RSI (405(g)) |
| ☐ 895 Freedom of Info. Act | ☐ 230 Rent Lease & Ejectment | | | | FEDERAL TAX SUITS |
| ☐ 900 Appeal of Fee Determi-nation Under Equal Access to Justice | ☐ 240 Torts to Land | | | | ☐ 870 Taxes (U.S. Plaintiff or Defendant) |
| ☐ 950 Constitutionality of State Statutes | ☐ 245 Tort Product Liability | | | | ☐ 871 IRS-Third Party 26 USC 7609 |
| | ☐ 290 All Other Real Property | | | | |

---

**FOR OFFICE USE ONLY:** Case Number:

**AFTER COMPLETING THE FRONT SIDE OF FORM CV-71, COMPLETE THE INFORMATION REQUESTED BELOW.**

CV-71 (05/08)                    CIVIL COVER SHEET                    Page 1 of 2

## CV09-02488

# UNITED STATES DISTRICT COURT, CENTRAL DISTRICT OF CALIFORNIA
## CIVIL COVER SHEET

**VIII(a). IDENTICAL CASES:** Has this action been previously filed in this court and dismissed, remanded or closed? ☑ No ☐ Yes
If yes, list case number(s): _____

**VIII(b). RELATED CASES:** Have any cases been previously filed in this court that are related to the present case? ☐ No ☑ Yes
If yes, list case number(s): Roberts v. UnitedHealth Group, Inc., et al, Case No. CV-09-1886-PSG

**Civil cases are deemed related if a previously filed case and the present case:**
(Check all boxes that apply) ☑ A. Arise from the same or closely related transactions, happenings, or events; or
☑ B. Call for determination of the same or substantially related or similar questions of law and fact; or
☐ C. For other reasons would entail substantial duplication of labor if heard by different judges; or
☐ D. Involve the same patent, trademark or copyright, and one of the factors identified above in a, b or c also is present.

---

**IX. VENUE:** (When completing the following information, use an additional sheet if necessary.)

(a) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named plaintiff resides.
☐ Check here if the government, its agencies or employees is a named plaintiff. If this box is checked, go to item (b).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| None | Sacramento |

(b) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** named defendant resides.
☐ Check here if the government, its agencies or employees is a named defendant. If this box is checked, go to item (c).

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles | Minnesota, Indiana |

(c) List the County in this District; California County outside of this District; State if other than California; or Foreign Country, in which **EACH** claim arose.
**Note: In land condemnation cases, use the location of the tract of land involved.**

| County in this District:* | California County outside of this District; State, if other than California; or Foreign Country |
|---|---|
| Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, San Luis Obispo | All California counties outside of this District and nationwide |

**\* Los Angeles, Orange, San Bernardino, Riverside, Ventura, Santa Barbara, or San Luis Obispo Counties**
Note: In land condemnation cases, use the location of the tract of land involved

X. SIGNATURE OF ATTORNEY (OR PRO PER): _____ Date April 9, 2009

**Notice to Counsel/Parties:** The CV-71 (JS-44) Civil Cover Sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law. This form, approved by the Judicial Conference of the United States in September 1974, is required pursuant to Local Rule 3-1 is not filed but is used by the Clerk of the Court for the purpose of statistics, venue and initiating the civil docket sheet. (For more detailed instructions, see separate instructions sheet.)

Key to Statistical codes relating to Social Security Cases:

| Nature of Suit Code | Abbreviation | Substantive Statement of Cause of Action |
|---|---|---|
| 861 | HIA | All claims for health insurance benefits (Medicare) under Title 18, Part A, of the Social Security Act, as amended. Also, include claims by hospitals, skilled nursing facilities, etc., for certification as providers of services under the program. (42 U.S.C. 1935FF(b)) |
| 862 | BL | All claims for "Black Lung" benefits under Title 4, Part B, of the Federal Coal Mine Health and Safety Act of 1969. (30 U.S.C. 923) |
| 863 | DIWC | All claims filed by insured workers for disability insurance benefits under Title 2 of the Social Security Act, as amended; plus all claims filed for child's insurance benefits based on disability. (42 U.S.C. 405(g)) |
| 863 | DIWW | All claims filed for widows or widowers insurance benefits based on disability under Title 2 of the Social Security Act, as amended. (42 U.S.C. 405(g)) |
| 864 | SSID | All claims for supplemental security income payments based upon disability filed under Title 16 of the Social Security Act, as amended. |
| 865 | RSI | All claims for retirement (old age) and survivors benefits under Title 2 of the Social Security Act, as amended. (42 U.S.C. (g)) |